GARY HARRIS, JOSEPH B. KINARD, JOHN S. EAGLE, WAYMON TATE, JR., RAYFORD JONES, JOHN L. McGRIFF, AND LESLEY G. BELLINGER, THE PLAINTIFFS SUING ON BEHALF OF SAINT LUKE MISSIONARY BAPTIST CHURCH, INC. v. CLIFFORD J. MATTHEWS, JR., SHARLA BYRD, AND AARON MOORE

No. 479PA05-2

(Filed 4 May 2007)

**1. Appeal and Error— appealability—church finances—First Amendment rights**

. First Amendment rights are substantial and are implicated when a party asserts that a civil court action cannot proceed without impermissibly entangling the court in ecclesiastical matters. The defendant here had an immediate right of appeal from the denial of his motion to dismiss claims involving the conversion of church funds and the breach of fiduciary duty by a pastor, church secretary, and the chairman of the church's Board of Trustees.

**2. Churches and Religion— internal property dispute—judicial action on neutral principles of law only**

When a congregational church's internal property dispute cannot be resolved using neutral principles of law, the courts must intrude no further and must instead defer to the decisions by a majority of its members or by such other local organism as it may have instituted for the purpose of ecclesiastical government. Civil court intervention into church property disputes is

proper only when relationships involving church property have been structured so that the civil courts are not required to resolve ecclesiastical questions.

**3. Churches and Religion— conversion of funds—understanding of roles within church—doctrine and practice rather than neutral legal principles**

Issues in a church dispute involving claims of conversion or breach of fiduciary duty could not be addressed using neutral principles of law because a church's religious doctrine and practice affect its understanding of church management and the role and authority of the pastor, staff, and church leaders.

**4. Churches and Religion— nonprofit corporation—First Amendment rights not forfeited**

A church that incorporates under the North Carolina Nonprofit Corporation Act does not forfeit its fundamental First Amendment rights. Regardless of a church's corporate structure, the Constitution requires courts to defer to the church's internal governing body with regard to ecclesiastical decisions concerning church management and use of funds.

**5. Churches and Religion— conversion of funds—neutral principles of law not available—further discovery not needed**

Additional discovery was not necessary in an action involving church funds, and a motion to dismiss was properly allowed. Once it became clear that no neutral principles of law existed to resolve plaintiffs lawsuit, continued involvement by the trial court became unnecessary and unconstitutional; additional discovery would only further entangle the trial court in ecclesiastical matters.

Justice MARTIN did not participate in the consideration or decision of the case.

Justice BRADY concurring.

Justice HUDSON dissenting.

Justice TIMMONS-GOODSON joins this dissenting opinion.

On discretionary review pursuant to N.C.G.S. § 7A-31 of an unpublished decision of the Court of Appeals, 176 N.C. App. 189, 625 S.E.2d 917 (2006) (per curiam), dismissing an appeal by defend-

**HARRIS v. MATTHEWS**

[361 N.C. 265 (2007)]

ant Clifford J. Matthews, Jr. from an order denying his motion to dismiss entered 6 October 2004 by Judge Marcus L. Johnson in Superior Court, Mecklenburg County. Heard in the Supreme Court 8 January 2007.

*Knox, Brotherton, Knox & Godfrey, by H. Edward Knox and Lisa G. Godfrey, and John J. Korzen for plaintiff-appellees.*

*Poyner & Spruill LLP, by Steven A. Rowe and Joshua B. Durham, for defendant-appellant Clifford J. Matthews, Jr.*

NEWBY, Justice.

This case, involving an internal church governance dispute, presents two issues. First, we must decide whether defendant has the right to immediately appeal the trial court's interlocutory order denying his motion to dismiss for lack of subject matter jurisdiction. Because we hold defendant can appeal the interlocutory order, we also address whether the restraints of the First Amendment of the United States Constitution, as applied to the states through the Fourteenth Amendment, preclude judicial intervention in this internal church controversy.

## I. BACKGROUND

Saint Luke Missionary Baptist Church ("Saint Luke"), an unaffiliated congregational church, was formed in 1950 as an unincorporated association. Like most congregational churches, Saint Luke's governing authority resides in a majority of the membership. Reverend L.D. Parker served as Saint Luke's pastor from the church's formation until his death in 1998. Defendant Clifford J. Matthews, Jr. ("Matthews") became Saint Luke's interim pastor in October 1999 and, following a congregational vote, was installed as pastor in May 2000.

After defendant Matthews' installation, Saint Luke underwent several changes to its organizational structure. At a congregational meeting on 9 December 2001, Saint Luke's members approved a new set of bylaws for the church. The bylaws created an internal governing body, the "Council for Ministry," with broad authority to manage the "business and affairs" of the church. On 13 March 2002, Saint Luke transferred its assets to Saint Luke Missionary Baptist Church, Inc., a North Carolina nonprofit corporation.

HARRIS v. MATTHEWS

[361 N.C. 265 (2007)]

Some members of Saint Luke, including the named plaintiffs, expressed concern over the changes. On multiple occasions, they requested access to the church's financial records, but were denied. On 3 July 2002, plaintiffs Joseph B. Kinard and John S. Eagle filed suit pursuant to N.C.G.S. § 55A-16-4 for production of Saint Luke's legal and financial records. On 23 July 2002, the trial court entered an order requiring Saint Luke to produce the documents. After reviewing the documents, plaintiffs believed that church funds had been misappropriated by Saint Luke's pastor (defendant Matthews), secretary (defendant Sharla Byrd), and chairman of the Board of Trustees (defendant Aaron Moore).

On 16 July 2003, pursuant to N.C.G.S. § 55A-7-40, plaintiffs filed suit, as members, on behalf of Saint Luke, alleging conversion of funds, breach of fiduciary duty, and civil conspiracy by defendants. The plaintiffs sought return of the disputed funds and punitive damages on behalf of Saint Luke. A somewhat lengthy procedural process ensued. Defendants moved to dismiss the complaint pursuant to N.C.G.S. § 55A-7-40(b), alleging that plaintiffs failed to demand an investigation by the church's governing body before filing suit, but the trial court denied the motions on 5 November 2003. Defendant Matthews, through new counsel, moved on 1 September 2004 to dismiss the complaint for lack of subject matter jurisdiction. The trial court denied this motion on 6 October 2004. Defendant Matthews appealed, and plaintiffs filed a motion to dismiss the appeal, alleging in part that the appeal was interlocutory. On 18 August 2005, the Court of Appeals allowed plaintiffs' motion to dismiss defendant's appeal. On 1 December 2005, we dismissed defendant's notice of appeal and denied his petition for discretionary review, but allowed his petition for writ of certiorari "for the limited purpose of remanding this case to the Court of Appeals for more thorough consideration in light of *Tubiolo v. Abundant Life Church, Inc.*, 167 N.C. App. 324, 605 S.E.2d 161 (2004), *disc. rev. denied*, 359 N.C. 326, 611 S.E.2d 853, *cert. denied*, [546] U.S. [819], 126 S. Ct. 350, 163 L. Ed. 2d 59 (2005)." *Harris v. Matthews*, 360 N.C. 175, 626 S.E.2d 297 (2005). The Court of Appeals again dismissed defendant's appeal on 21 February 2006, holding that defendant had not obtained Rule 54(b) certification from the trial court and that defendant did not possess a substantial right that would be irreparably damaged if his interlocutory appeal was delayed. Defendant again sought review by this Court, which allowed his petition for discretionary review on 17 August 2006.

**HARRIS v. MATTHEWS**

[361 N.C. 265 (2007)]

## II. INTERLOCUTORY APPEAL

**[1]** Defendant's appeal from the trial court's denial of his motion to dismiss for lack of subject matter jurisdiction is interlocutory. *See Veazey v. City of Durham*, 231 N.C. 357, 362, 57 S.E.2d 377, 381 (1950) ("An interlocutory order is one made during the pendency of an action, which does not dispose of the case, but leaves it for further action by the trial court in order to settle and determine the entire controversy."). "Generally, there is no right of immediate appeal from interlocutory orders and judgments." *Goldston v. Am. Motors Corp.*, 326 N.C. 723, 725, 392 S.E.2d 735, 736 (1990). This general prohibition against immediate appeal exists because "[t]here is no more effective way to procrastinate the administration of justice than that of bringing cases to an appellate court piecemeal through the medium of successive appeals from intermediate orders." *Veazey*, 231 N.C. at 363, 57 S.E.2d at 382. However, interlocutory orders are immediately appealable if they: "(1) affect a substantial right and (2) [will] work injury if not corrected before final judgment." *Goldston*, 326 N.C. at 728, 392 S.E.2d at 737.[1]

Defendant asserts that the trial court's order affects substantial First Amendment rights. We agree. The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. Likewise, the "comparable provision" in the North Carolina Constitution declares that "[a]ll persons have a natural and inalienable right to worship Almighty God according to the dictates of their own consciences, and no human authority shall, in any case whatever, control or interfere with the rights of conscience." N.C. Const. art. I, § 13 ("Religious liberty"); *see Atkins v. Walker*, 284 N.C. 306, 318, 200 S.E.2d 641, 649 (1973).

The United States Supreme Court has found First Amendment rights to be substantial, *Frisby v. Schultz*, 487 U.S. 474, 479, 108 S. Ct. 2495, 2499, 101 L. Ed. 2d 420, 428 (1988) (noting that First Amendment right to picket is substantial), and has held the First Amendment prevents courts from becoming entangled in internal church governance concerning ecclesiastical matters, *Presby-*

---

1. An interlocutory order is also immediately appealable if the trial court certifies that: (1) the order represents a final judgment as to one or more claims in a multi-claim lawsuit or one or more parties in a multi-party lawsuit, and (2) there is no just reason to delay the appeal. N.C.G.S. § 1A-1, Rule 54(b) (2005). Rule 54(b) is not applicable to this case because the trial court's denial of defendant's motion to dismiss was not a final judgment as to any party or claim.

*terian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 451-52, 89 S. Ct. 601, 607, 21 L. Ed. 2d 658, 666-67 (1969). When First Amendment rights are asserted, this Court has allowed appeals from interlocutory orders. *Priest v. Sobeck*, 153 N.C. App. 662, 571 S.E.2d 75 (2002), *rev'd per curiam*, 357 N.C. 159, 579 S.E.2d 250 (2003) (for reasons stated in the dissenting opinion, thus finding in a defamation action that a trial court order concerning actual malice affected a substantial First Amendment right and was therefore immediately appealable). Accordingly, we reaffirm our stance that First Amendment rights are substantial and hold that First Amendment rights are implicated when a party asserts that a civil court action cannot proceed without impermissibly entangling the court in ecclesiastical matters.

Further, we are unpersuaded by plaintiffs' suggestion that defendant cannot raise entanglement concerns. The constitutional prohibition against court entanglement in ecclesiastical matters is necessary to protect First Amendment rights identified by the "Establishment Clause" and the "Free Exercise Clause." *See* Erwin Chemerinsky, *Constitutional Law: Principles and Policies* 1218 n.129 (2d ed. 2002) ("Analytically, it does not seem to matter whether this [court involvement in internal church disputes] issue is characterized as a free exercise clause issue or one involving the establishment clause."). These rights are not held by church bodies alone. They have been consistently asserted by individuals to challenge administrative, legislative, and judicial actions. *See, e.g., Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 124 S. Ct. 2301, 159 L. Ed. 2d 98 (2004); *Wallace v. Jaffree*, 472 U.S. 38, 105 S. Ct. 2479, 86 L. Ed. 2d 29 (1985); *Jones v. Wolf*, 443 U.S. 595, 99 S. Ct. 3020, 61 L. Ed. 2d 775 (1979); *Lemon v. Kurtzman*, 403 U.S. 602, 91 S. Ct. 2105, 29 L. Ed. 2d 745 (1971); *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 20 L. Ed. 666 (1871).

It is not determinative that the trial court's order affects a substantial right. The order must also work injury if not corrected before final judgment. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 2690, 49 L. Ed. 2d 547, 565 (1976) (plurality). In *Elrod*, the United States Supreme Court held injunctive relief appropriate in situations in which "First Amendment interests were either threatened or in fact being impaired at the time relief was sought." *Id*. Likewise, when First Amendment rights are threatened or impaired by an interlocutory order, immediate appeal is appropriate.

In short, we find defendant's substantial First Amendment rights are affected by the trial court's order denying his motion to dismiss. Further, these rights will be impaired or lost and defendant will be irreparably injured if the trial court becomes entangled in ecclesiastical matters from which it should have abstained. Therefore, defendant has the right to immediately appeal the trial court order denying his motion to dismiss for lack of subject matter jurisdiction on impermissible entanglement grounds.

## III. IMPERMISSIBLE ENTANGLEMENT

[2] Having determined that defendant has a right to immediately appeal, we now address the merits of defendant's impermissible entanglement argument. We review Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction de novo and may consider matters outside the pleadings. 2 James Wm. Moore et al., *Moore's Federal Practice* §§ 12.30[3], .30[5] (3d ed. 2006); *see also Tubiolo v. Abundant Life Church, Inc.*, 167 N.C. App. at 327, 605 S.E.2d at 163.

"[T]he First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes." *Presbyterian*, 393 U.S. at 449, 89 S. Ct. at 606, 21 L. Ed. 2d at 665. In *Presbyterian*, two local Presbyterian churches withdrew from a hierarchical general church organization, and a dispute arose over who owned the local churches' properties. *Id.* at 441-43, 89 S. Ct. at 602-03, 21 L. Ed. 2d at 661-62. Under Georgia law, resolution of the property ownership turned on a jury's decision as to whether the general church's actions which caused the local church withdrawals, " 'amount[ed] to a fundamental or substantial abandonment of the original tenets and doctrines of the [general church].' " *Id.* at 443-44, 89 S. Ct. at 603, 21 L. Ed. 2d at 662 (second alteration in original). The United States Supreme Court held this to be an improper inquiry for a court.

Although "[c]ivil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property[,] . . . First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice." *Id.* at 449, 89 S. Ct. at 606, 21 L. Ed. 2d at 665. Civil court intervention into church property disputes is proper only when "relationships involving church property [have been structured] so as not to require the civil courts to resolve ecclesiastical questions." *Id.* When a congrega-

HARRIS v. MATTHEWS

[361 N.C. 265 (2007)]

tional church's internal property dispute cannot be resolved using neutral principles of law, the courts must intrude no further and must instead defer to the decisions "by a majority of its members or by such other local organism as it may have instituted for the purpose of ecclesiastical government." *Watson*, 80 U.S. (13 Wall.) at 724, 20 L. Ed. at 675.

This Court applied *Presbyterian* to a church property dispute in *Atkins v. Walker*, 284 N.C. 306, 200 S.E.2d 641 (1973). A minority of the members of a Missionary Baptist Church congregation argued they were entitled to possession of church property as a result of several improper actions taken by the church and its leaders. We recognized the constitutional boundaries set by *Presbyterian*, concluding that court review should be limited to questions that can be "resolved on the basis of [neutral] principles of law" such as "(1) [w]ho constitutes the governing body of this particular [church], and (2) who has that governing body determined to be entitled to use the properties." *Id.* at 319, 200 S.E.2d at 650.

In *Atkins*, the plaintiffs could have challenged the validity of church action "by showing that such action was not taken in a meeting duly called and conducted according to the procedures of the church." *Id.* at 320, 200 S.E.2d at 651. However, because nothing in the record suggested that any actions of which the plaintiffs complained were not properly taken at a meeting of the church's governing body (the congregation), we concluded the trial court's decision could only have been based on factors that it was constitutionally prohibited from considering. *Id.* at 321, 200 S.E.2d at 651.

As in *Atkins*, we again must decide whether certain claims brought by a minority faction of a congregational church fall under the severely circumscribed role of the courts or whether the allegations must be addressed by the church itself through its own internal governing body. And, as in *Atkins*, we conclude that the civil courts are constitutionally prohibited from addressing plaintiffs' claims.

[3] Plaintiffs first allege that defendant Matthews has usurped the governmental authority of the church's internal governing body. The remainder of plaintiffs' causes of action seek damages for the church as a proximate result of defendants' breach of fiduciary duty and conversion of church funds, stemming from defendants' civil conspiracy to convert funds. Based on these claims, plaintiffs also seek punitive damages on behalf of the church.

**HARRIS v. MATTHEWS**

[361 N.C. 265 (2007)]

Plaintiffs do not ask the court to determine who constitutes the governing body of Saint Luke or whom that body has authorized to expend church resources. Rather, plaintiffs argue Saint Luke is entitled to recover damages from defendants because they breached their fiduciary duties by improperly using church funds, which constitutes conversion. Determining whether actions, including expenditures, by a church's pastor, secretary, and chairman of the Board of Trustees were proper requires an examination of the church's view of the role of the pastor, staff, and church leaders, their authority and compensation, and church management. Because a church's religious doctrine and practice affect its understanding of each of these concepts, seeking a court's review of the matters presented here is no different than asking a court to determine whether a particular church's grounds for membership are spiritually or doctrinally correct or whether a church's charitable pursuits accord with the congregation's beliefs. None of these issues can be addressed using neutral principles of law.

Here, for example, in order to address plaintiffs' claims, the trial court would be required to interpose its judgment as to both the proper role of these church officials and whether each expenditure was proper in light of Saint Luke's religious doctrine and practice, to the exclusion of the judgment of the church's duly constituted leadership. This is precisely the type of ecclesiastical inquiry courts are forbidden to make. *See Jones v. Wolf*, 443 U.S. at 602, 99 S. Ct. at 3025, 61 L. Ed. 2d at 784 ("Most importantly, the First Amendment prohibits civil courts from resolving church property disputes on the basis of religious doctrine and practice." (citing *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 710, 96 S. Ct. 2372, 2381, 49 L. Ed. 2d 151, 163 (1976); *Md. & Va. Eldership of Churches of God v. Church of God at Sharpsburg, Inc.*, 396 U.S. 367, 368, 90 S. Ct. 499, 500, 24 L. Ed. 2d 582, 583 (1970) (per curiam); *Presbyterian*, 393 U.S. at 449, 89 S. Ct. at 606, 21 L. Ed. 2d at 665)).

Because no neutral principles of law exist to resolve plaintiffs' claims, the courts must defer to the church's internal governing body, the Council for Ministry, thereby avoiding becoming impermissibly entangled in the dispute.[2] *See Watson*, 80 U.S. (13 Wall.) at 724, 20

---

2. Concluding that the trial court's adjudication of plaintiffs' conversion claim would constitute impermissible entanglement, necessarily precludes adjudication of plaintiffs' civil conspiracy claim since civil conspiracy is premised on the underlying act. *See Muse v. Morrison*, 234 N.C. 195, 198, 66 S.E.2d 783, 785 (1951). Similarly, once plaintiffs' other claims are dismissed, their punitive damages claim fails.

L. Ed. at 675. Having been delegated broad oversight authority by the congregation, the Council for Ministry has already considered some of expenditures challenged by plaintiffs, taken action, and declared the matter closed. Plaintiffs' complaint does not challenge the authority of the Council for Ministry or argue that the Council did not follow its own internal governance procedures.[3] Plaintiffs simply object to the Council's determination that the expenditures were proper. Although it has not specifically considered every issue raised by plaintiffs, as Saint Luke's internal governing body, the Council for Ministry is the only authority constitutionally permitted to decide matters that cannot be resolved using neutral principles of law. Unless Saint Luke, through its congregation and following proper internal procedures, revokes the Council for Ministry's authority to resolve church disputes, plaintiffs must raise their concerns with the Council for Ministry and accept the resolutions reached by that governing body.

[4] Plaintiffs make the broad assertion that, because Saint Luke is a nonprofit corporation, the North Carolina Nonprofit Corporation Act can be used to resolve the dispute. N.C.G.S. §§ 55A-1-01 to -17-05. (2005). However, a church that incorporates under the North Carolina Nonprofit Corporation Act does not forfeit its fundamental First Amendment rights. Regardless of a church's corporate structure, the Constitution requires courts to defer to the church's internal governing body with regard to ecclesiastical decisions concerning church management and use of funds.

[5] Finally, we are unpersuaded by plaintiffs' argument that defendants' motion to dismiss should not be allowed because discovery is incomplete. The trial court properly opened its door to this church property dispute. However, once it became clear that no neutral principles of law existed to resolve plaintiffs' lawsuit, continued involvement by the trial court became unnecessary and unconstitutional. Additional discovery will only further entangle the trial court in ecclesiastical matters, notwithstanding that there is no issue it can constitutionally decide.

When a party brings a proper complaint, " '[w]here civil, contract[,] or property rights are involved, the courts will inquire as to ·

---

3. Although plaintiffs, in their appellate briefs and through affidavits, have challenged the authority of the Council for Ministry and suggested that the Council for Ministry did not follow its internal governance procedures, plaintiffs have not attempted to amend or supplement their complaint to include these allegations, and as such the allegations·are not properly before this Court or the trial court. N.C.G.S. § 1A-1, Rules 8(a), 15 (2005).

whether the church tribunal acted within the scope of its authority and observed its own organic forms and rules.' " *Atkins*, 284 N.C. at 320, 200 S.E.2d at 650 (quoting *W. Conference of Original Free Will Baptists v. Creech*, 256 N.C. 128, 140-41, 123 S.E.2d 619, 627 (1962)). But when a party challenges church actions involving religious doctrine and practice, court intervention is constitutionally forbidden.

## IV. DISPOSITION

The decision of the Court of Appeals is reversed and this case is remanded to that court for further remand to the trial court for proceedings not inconsistent with this opinion.

REVERSED AND REMANDED.

Justice MARTIN did not participate in the consideration or decision of this case.

Justice BRADY concurring.

I concur fully in the reasoning and result of the majority opinion and join that opinion in its entirety. However, as Joshua and the tribes of Israel were compelled to march around the walls of Jericho as the priests blew the horns, I am compelled to write separately to provide a word of caution: While the metaphor of a "wall of separation between church and state" may fit nicely in a case such as the one *sub judice*, it is generally a misplaced metaphor that should not occupy such a lofty position in religious freedom jurisprudence. Even a brief review of the exchange between Thomas Jefferson and the Danbury Association of Baptists demonstrates that the metaphor "separation of church and state"[4] has been wrenched torturously out of context in many circumstances to require "neutrality on the part of

---

4. This metaphor, however, does not have its origins in Jefferson's letter. Roger Williams, a prominent 17th Century religious figure, wrote that the Old Testament "Church of the Jews" and the New Testament Church

> were both separate from the world; and that when they have opened a gap in the hedge or wall of Separation between the Garden of the Church and the Wildernes of the world, God hath ever broke down the wall it selfe, removed the Candlestick, &c. and made his Garden a Wildernesse, as at this day.

Roger Williams, *Mr. Cotton's Letter Lately Printed Examined and Answered* 108 (London 1644), *reprinted in* 1 *The Complete Writings of Roger Williams* (1963). "Although Williams['s] principal concern in the separation of church and state was to preserve the church from worldly contamination, he also believed that government suffered when diverted from its proper functions by the church." Edmund S. Morgan, *Roger Williams: The Church and the State*, 118 (1967).

government between religion and irreligion." *See Wallace v. Jaffree,* 472 U.S. 38, 98 (1985) (Rehnquist, J., dissenting).

Although it is not necessary to extensively discuss this topic, just a brief consideration displays the truth of the statement written by Benjamin Cardozo while sitting on the New York Court of Appeals before his appointment to our nation's highest court: "Metaphors in law are to be narrowly watched, for starting as devices to liberate thought, they end often by enslaving it." *Berkey v. Third Ave. Ry. Co.,* 244 N.Y. 84, 94, 155 N.E. 58, 61 (1926). This enslaving of Establishment Clause jurisprudence by a mistaken metaphor ignores the his- ·torical fact that "[o]ur Founding Fathers never intended that we utilize the Establishment Clause of the United States Constitution or any other laws to sterilize our public forums by removing all references to our religious beliefs." *State v. Haselden,* 357 N.C. 1, 32, 577 S.E.2d 594, 613 (2003) (Brady, J., concurring) (citations omitted).

## HISTORICAL BACKGROUND

The phrase "separation between church and state" appears nowhere in the text of the Constitution or its amendments. However, courts have used it as a basis for a policy of rigid separation, "[n]otwithstanding the absence of a historical basis for this theory." *Wallace,* 472 U.S. at 106 (Rehnquist, J., dissenting). The phrase was first injected into religion clause jurisprudence by the Supreme Court of the United States in *Reynolds v. United States,* 98 U.S. 145, 164 (1878), a case dealing with a Mormon's free exercise challenge to a polygamy law. The concept was further elaborated upon in *Everson v. Board of Education,* 330 U.S. 1, 16 (1947), which concerned public funding of transportation for parochial students. The phrase has since become an integral part of judicial analysis under the religion clauses. However, a review of the history surrounding the phrase "wall of separation between church and state" demonstrates that it should be either discarded or its use restricted to cases such as the one *sub judice.*

Justice Rehnquist solidly and succinctly set out the historical background of the Establishment Clause in his dissent in *Wallace v. Jaffree,* and I would not undertake to restate that history here. However, I note, as I have expressed before, that the first Congress authorized the appointment of compensated congressional chaplains only days before approving the final draft of the Bill of Rights. *See Haselden,* 357 N.C. at 32, 577 S.E.2d at 613-14 (Brady, J., concurring) (citing *Marsh v. Chambers,* 463 U.S. 783, 788 (1983)). I have previ-

ously noted this nation's history of opening congressional sessions with prayer, providing for chaplains in each branch of our armed forces, and using invocations and benedictions at both state and federal ceremonial installations and inaugurations. *Id.* at 32, 577 S.E.2d at 614 (Brady, J., concurring) (citations omitted). Additionally, "[t]he United States Congress has provided for the national motto reflecting our religious heritage, 'In God we trust,' 36 U.S.C.A. § 302 (West 2001), and has mandated that it 'shall' be inscribed onto our currency, 31 U.S.C.A. § 5112(d)(1) (West 2003)." *Id.* at 32-33, 577 S.E.2d at 614 (Brady, J., concurring). Moreover, this Court and countless other tribunals around the country "open their sessions asking God to save their honorable courts." *Id.* at 33, 577 S.E.2d at 614 (Brady, J., concurring). Even before the founding of this nation, the Mayflower Compact demonstrated our early emigrants' recognition of God's sovereignty, stating that one purpose of their to-be-formed colony was "Advancement of the Christian Faith." *See* Mayflower Compact (1620). Prior to the enactment of the Fourteenth Amendment, many states in the early history of our country had an organized, state-sponsored religion. *See Wallace*, 472 U.S. at 99, n.4 (Rehnquist, J., dissenting). In fact, North Carolina disestablished the Church of England in its first constitution, displaying its power to establish or disestablish a State church during that period. *See* John V. Orth, *The North Carolina State Constitution with History and Commentary* 49 (Univ. of N.C. Press 1995) (1993).

This is certainly not to endorse the establishment of a State church in North Carolina, or any other State for that matter. When the State sets up an official religion and excludes all others from lawful worship, the results are disastrous. *See* Robert G. Torbet, *A History of the Baptists* 242-43 (3d ed. 2000) (discussing the "Battle of Alamance," which occurred in 1771 and the religious oppression of Baptists under Governor Tryon). When courts become involved in ecclesiastical matters, the result is the same as a state established religion—the losing party must submit to the decision of the court under penalty of law without regard to his own personal rights of conscience. To reflect that concern, the North Carolina Constitution provides: "All persons have a natural and inalienable right to worship Almighty God according to the dictates of their own consciences, and no human authority shall, in any case whatever, control or interfere with the rights of conscience." N.C. Const. art. I, § 13. That states were free to establish and disestablish religion during the early periods of our country clearly demonstrates that a strict "neutrality on the part of government between religion and irreligion" was never

intended by our Founding Fathers. *Wallace*, 472 U.S. at 98 (Rehnquist, J., dissenting).

Many of our Presidents, such as George Washington and Abraham Lincoln, have chosen to include scriptural readings in their inaugural speeches. *See* Richard Land, *The Divided States of America?* 84-87 (2007) (collecting quotes of scripture from presidential inaugurations). President Washington recognized the need for religion and morality in the young country. In his "farewell address" to the nation, he eloquently stated:

> Of all the dispositions and habits which lead to political prosperity, religion and morality are indispensable supports. In vain would that man claim the tribute of patriotism, who should labor to subvert these great pillars of human happiness, these firmest props of the duties of men and citizens. The mere politician, equally with the pious man, ought to respect and to cherish them. A volume could not trace all their connections with private and public felicity. Let it simply be asked, Where is the security for property, for reputation, for life, if the sense of religious obligation desert the oaths which are the instruments of investigation in courts of justice? And let us with caution indulge the supposition that morality can be maintained without religion. Whatever may be conceded to the influence of refined education on minds of peculiar structure, reason and experience both forbid us to expect that national morality can prevail in exclusion of religious principle.

> It is substantially true that virtue or morality is a necessary spring of popular government. The rule, indeed, extends with more or less force to every species of free government. Who that is a sincere friend to it can look with indifference upon attempts to shake the foundation of the fabric?

George Washington, Farewell Address (Sept. 19, 1796).

### ANALYZING THE TEXT OF THE LETTER

Viewing the correspondence of the exchange between the Danbury Association of Baptists and Thomas Jefferson by focusing on the context surrounding the "wall of separation" metaphor sheds extensive light on its meaning. The Association feared that its members would suffer because of their minority beliefs. Moreover, the members of the Association were concerned that those "who seek after *power & gain* under the pretence of *government & Religion*

**HARRIS v. MATTHEWS**

[361 N.C. 265 (2007)]

should reproach their fellow men" and would also "reproach" President Jefferson "because he will not, dares not assume the prerogative of Jehovah and make Laws to govern the Kingdom of Christ." Letter from the Danbury Baptist Association to Thomas Jefferson (Oct. 7, 1801), *in* Daniel L. Dreisbach, *Thomas Jefferson and the Wall of Separation between Church and State* 31 (2002) [hereinafter Dreisbach, *Wall of Separation*]. Thus, the Association was concerned about governmental regulation in the sphere of religion. In a thoughtfully considered and eloquently penned response, Jefferson wrote to the Association:

> Believing with you that religion is a matter which lies solely between Man & his God, that he owes account to none other for his faith or his worship, that the legislative powers of government reach actions only, & not opinions, I contemplate with sovereign reverence that act of the whole American people which declared that their legislature should "make no law respecting an establishment of religion, or prohibiting the free exercise thereof," thus building a wall of separation between Church & State . . . .

Letter from Thomas Jefferson to the Danbury Baptist Association (Jan. 1, 1802), *in* Dreisbach, *Wall of Separation* 48. Thus, in response to the Association's fears of persecution and government intermeddling with the affairs of the Church, Jefferson merely assured them that his position was that the First Amendment would not allow Congress to do so.

The "wall of separation" metaphor should only be used, if at all, in cases such as the one *sub judice*. In other words, the gate to the "wall of separation" only swings one way, locking the government out of ecclesiastical matters. Because no religious right is more precious than the right to form one's own religious opinions without interference from the civil government, I concur fully in the Court's opinion.

Justice HUDSON dissenting.

Because I believe that the Court of Appeals correctly dismissed this case as interlocutory, I respectfully dissent.

Defendant does not dispute that there was no final judgment in this case and that his appeal is thus interlocutory. However, "N.C.G.S. § 1-277 and N.C.G.S. § 7A-27(d) allow an appeal to be taken from an interlocutory order which affects a substantial right although the appeal may be interlocutory." *DKH Corp. v. Rankin-Patterson Oil*

*Co.*, 348 N.C. 583, 585, 500 S.E.2d 666, 668 (1998). Defendant contends, and the majority agrees, that adjudication of this matter would require a court to impermissibly delve into and entangle itself in ecclesiastical matters in violation of the First Amendment. While I agree that such entanglement would affect a substantial right under the First Amendment, I do not agree that at this stage of this lawsuit, any such entanglement appears, or that a substantial right of defendant's would be threatened or impaired, if this case proceeds.

Although the First Amendment prohibits courts from becoming entangled in ecclesiastical matters, "[i]t nevertheless remains the duty of civil courts to determine controversies concerning property rights over which such courts have jurisdiction and which are properly brought before them, notwithstanding the fact that the property is church property." *Atkins v. Walker*, 284 N.C. 306, 318, 200 S.E.2d 641, 649 (1973). "Neither the First Amendment to the Constitution of the United States nor the comparable provision in Article I, Section 13, of the Constitution of North Carolina deprives those entitled to the use and control of church property of protections afforded by government to all property owners alike . . . [including] access to the courts for the determination of contract and property rights." *Id.* (citing *Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 89 S. Ct. 601, 21 L. Ed. 2d 658 (1969)). The pleadings and attached affidavits here indicate that the disputed issues in this case involve whether defendant used church property without proper authority. There is no reference in any of the pleadings or other supporting documents to any doctrinal issue. Rather, the issues as developed thus far involve, purely and simply, property matters.

I cannot agree with the majority's contention that "First Amendment rights are implicated when a party *asserts* that a civil court action cannot proceed without impermissibly entangling the court in ecclesiastical matters," even though the pleadings reflect otherwise. (Emphasis added.) First, the cases the majority relies on do not support such a broad holding. Further, I fear that this approach could have the unintended consequence of allowing, or even inviting, misbehavior by church officials who could then avoid court review by baldly *asserting* that further review would result in impermissible entanglement in ecclesiastical matters.

The majority cites *Priest v. Sobeck* in support of its argument that when First Amendment rights are asserted, this Court has allowed appeals from interlocutory orders. 357 N.C. 159, 579 S.E.2d 250

**HARRIS v. MATTHEWS**

[361 N.C. 265 (2007)]

(2003), *rev'g per curiam for the reasons stated in the dissenting opinion, Priest v. Sobeck*, 153 N.C. App. 662, 571 S.E.2d 75 (2002). However, *Priest* is distinguishable. In *Priest*, union members sued a union representative alleging that she defamed them in a union newsletter by falsely and maliciously blaming them for the hiring of non-union members. 153 N.C. App. at 664-65, 571 S.E.2d at 77. The Court of Appeals concluded that regardless of the trial court's certification of the matter for interlocutory review, the partial grant of summary judgment neither constituted a final judgment nor affected defendants' substantial right to free speech. *Id.* at 667-69, 571 S.E.2d at 78-80. The dissent disagreed, concluding that the judgment was final as to one or more of plaintiff's claims and furthermore, that denial of defendants' summary judgment motion based on the trial court's misapplication of the "actual malice" standard would have a chilling effect on their First Amendment rights of free speech. *Id.* at 670-71, 571 S.E.2d at 80-81 (Greene, J., dissenting). This Court, per curiam, reversed the Court of Appeals "[f]or the reasons stated in the dissenting opinion." 357 N.C. at 159, 579 S.E.2d at 250.

Here, I see no such chilling effect and in fact, no infringement on a First Amendment right. Should it appear at a later stage in the lawsuit that matters of church doctrine seem to be at issue, any party or the court on its own motion may raise the issue of subject matter jurisdiction. At this point, though, it is difficult to see how we or the trial court would venture into ecclesiastical waters in order to decide whether defendant's expenses for clothing, airfare, or hotel rooms were authorized by the church. Defendant has not shown how these issues bear on his freedom to exercise his religion. Instead, these matters appear to bear entirely on defendant's exercise of personal and fiscal responsibility toward the very secular assets of the church. Thus, I conclude that this appeal does not threaten or impair a substantial right, and I would dismiss it as interlocutory.

Turning to the merits, defendant here appeals from the denial of his Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction. Both *Presbyterian Church* and *Atkins* involved cases which went to the jury, and in both cases, the Courts made clear that "[c]ivil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property." *Presbyterian Church*, 393 U.S. at 449, 89 S. Ct. at 606, 21 L. Ed. 2d at 665. In *Atkins*, this Court emphasized that it is "the duty of civil courts to determine controversies concerning property rights . . . notwithstanding the fact that the property is church property." 284 N.C. at 318, 200 S.E.2d at

649. In *Presbyterian*, two local churches withdrew from the general church over serious doctrinal differences and then sought to enjoin the general church from trespassing on disputed church property. 393 U.S. at 442-43, 89 S. Ct. at 602-03, 21 L. Ed. 2d at 661-62. The Georgia Supreme Court affirmed "a civil court jury decision as to whether the general church abandoned or departed from the tenets of faith and practice it held at the time the local churches affiliated with it." *Id.* at 441, 89 S. Ct. at 602, 21 L. Ed. 2d at 661. The United States Supreme Court concluded that the Georgia courts violated the First Amendment because the "church property litigation [wa]s made to turn on the resolution by civil courts of controversies over *religious doctrine and practice.*" *Id.* at 449, 89 S. Ct. at 606, 21 L. Ed. 2d at 665 (emphasis added). Similarly, in *Atkins*, this Court held that the First Amendment forbids a court decision about church property which depends on "a judicial determination that one group of claimants has adhered faithfully to the fundamental faiths, doctrines and practices of the church . . . while the other group of claimants has departed substantially therefrom." 284 N.C. at 318, 200 S.E.2d at 649. There, the issues submitted to the jury were:

> 1. Did the Plaintiffs remain faithful to the doctrines and practices of the Little Mountain Baptist Church recognized and accepted by the Plaintiffs and Defendants prior to the division?

> 2. Have the Defendants departed radically and fundamentally from the characteristic usages, customs, doctrines and practices of the Little Mountain Baptist Church accepted by all members prior to the division as alleged in the complaint?

*Id.* at 308, 200 S.E.2d at 643. Clearly, the court and jury were delving into matters of doctrine and belief.

Here, by contrast, no party alleged such doctrinal or ecclesiastical issues in the pleadings or affidavits. While there could conceivably be some impermissible infringement into doctrinal issues at some later point in this case, such possible future infringement is merely speculative. The record as developed thus far indicates no such infringement if this case were allowed to proceed beyond the Rule 12(b)(1) motion to dismiss.

This Court has held that church property disputes must be decided "pursuant to 'neutral principles of law.' " *Atkins, id.* at 319, 200 S.E.2d at 650 (quoting *Presbyterian,* 393 U.S. at 449, 89 S. Ct. at 606, 221 L. Ed. 2d at 665). The majority contends that "[b]ecause a

**HARRIS v. MATTHEWS**

[361 N.C. 265 (2007)]

church's religious doctrine and practice affect its understanding" of the "concepts" of "the role of the pastor, staff, and church leaders, their authority and compensation, and church management," none of the issues here can be addressed using neutral principles of law. The majority then asserts that because no neutral principles of law exist, we must defer to the church's internal governing body, the Council for Ministry. However, it appears to me that the courts could easily apply neutral principles· of law in this case to determine whether the Council for Ministry acted within the scope of its authority, which is an appropriate area of action for courts. Indeed, this Court, in *Atkins*, held that "[w]here civil, contract or property rights are involved, the courts will inquire as to whether the church tribunal acted within the scope of its authority and observed its own organic forms and rules." *Id.* at 320, 200 S.E.2d at 651 (citations and internal quotation marks omitted).

Here, plaintiffs, as members of a non-profit corporation church, brought suit in a derivative capacity pursuant to N.C.G.S. § 55A-7-40(a), alleging the following causes of action: that defendant converted church funds, breached a fiduciary duty owed to the church and its members, and engaged in a civil conspiracy to convert money and assets of the church. The majority argues that "in order to address plaintiffs' claims, the trial court would be required to interpose its judgment as to both the proper role of these church officials and whether each expenditure was proper in light of Saint Luke's religious doctrine and practice, to the exclusion of the church's duly constituted leadership." To the contrary, I conclude that each of plaintiff's claims could be resolved through the application of neutral principles of law.

Conversion is "an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." *In re Legg*, 325 N.C. 658, 669, 386 S.E.2d 174, 180 (1989), *cert. denied*, 496 U.S. 906, 110 S. Ct. 2589, 110 L. Ed. 2d 270 (1990) (citation and internal quotation marks omitted). Here, the law of conversion can be neutrally applied to this case to inquire whether defendant exercised a right of ownership over funds belonging to the church without authorization. The church's bylaws explicitly address expenditures, and a court can review whether or not the bylaws were followed, and thus whether the expenditures were authorized, without delving into the church's "religious doctrine and practice."

**HARRIS v. MATTHEWS**

[361 N.C. 265 (2007)]

Next, this Court has described the necessary elements for a claim of breach of fiduciary duty as follows:

> For a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties. Such a relationship has been broadly defined by this Court as one in which "there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence . . . ,[and] 'it extends to any possible case in which a fiduciary relationship exists in fact, and in which there is confidence reposed on one side, and resulting domination and influence on the other.' "

*Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707-08 (2001) (ellipses and brackets in original) (citations omitted) (emphasis added). I believe that a court could apply neutral principles defining fiduciary duty as the Court did in *Dalton* to consider whether defendant acted in good faith by looking at whether he followed the church's bylaws regarding spending and authorization for spending, and that such inquiry would not delve into ecclesiastical matters.

Finally, this Court has defined civil conspiracy as follows:

> A conspiracy has been defined as "an agreement between two or more individuals to do an unlawful act or to do a lawful act in an unlawful way." The common law action for civil conspiracy is for damages caused by acts committed pursuant to a conspiracy rather than for the conspiracy, *i.e.*, the agreement, itself. Thus to create civil liability for conspiracy there must have been an overt act committed by one or more of the conspirators pursuant to a common agreement and in furtherance of a common objective.

*Dickens v. Puryear*, 302 N.C. 437, 456, 276 S.E.2d 325, 337 (1981) (citations omitted). Plaintiffs assert that the object of the civil conspiracy here was to convert church money and assets. I agree with the majority that this claim is premised on the conversion claim; thus, as discussed above regarding the conversion claim, I believe this claim could also be decided without implicating the First Amendment.

In similar types of claims, courts in other jurisdictions have concluded that judicial consideration of whether a church followed its own internal procedures or governing documents does not violate the First Amendment. *Murphy v. Green*, 794 So. 2d 325, 330 (Ala. 2000) (holding that trial court properly concluded that defendants improp-

erly converted church funds in violation of church's "purpose" clause); *Abyssinia Missionary Baptist Church v. Nixon*, 340 So. 2d 746, 748 (Ala. 1976) (trial court erred in not allowing plaintiffs to present evidence as to "the proper established procedures of the Baptist Church on the issue of the validity of expulsion from membership"); *Ervin v. Lilydale Progressive Missionary Baptist Church*, 351 Ill.App.3d 41, 46, 813 N.E.2d 1073, 1078 (2004) ("The court can decide the issue by applying neutral legal principles to interpret the church's bylaws, handbook and covenant"); *Libhart v. Copeland*, 949 S.W.2d 783, 793 (Tex. App. 1997) (" '[T]he proceedings of the association are subject to judicial review where there is fraud, oppression, or bad faith, or property or civil rights are invaded, or the proceedings in question are violative of the laws of the [association], or the law of the land, or are illegal.' " (brackets in original) (citations omitted))

The majority concludes that plaintiffs have not adequately preserved any challenge to the authority of the church's Council for Ministry, or advanced any argument that the Council did not follow its own internal governance procedures, because plaintiffs did not make such allegations in their complaint. However, in his first motion to dismiss, under Rule 12(b)(6), defendant asserted that the bylaws of the church provide that "the business and affairs for the corporation shall be managed by its Council on [sic] Ministry . . . [and that] [t]he Council on [sic] Ministry, has, in fact, performed that responsibility." Furthermore, plaintiffs submitted affidavits from numerous members asserting that since defendant became pastor, there have been no congregational elections of the Council for Ministry, and that "[t]he individuals who serve as members of the Council of [sic] Ministry and other official positions of the church are appointed by Reverend Clifford Matthews, Jr. and serve at his pleasure." These affidavits also state that there has not been proper notice for church meetings, that no budget has been presented, and that votes are not being counted and minutes not being kept or published. The 4 November 2003 order of the trial court indicates that it considered the affidavits filed by plaintiffs in denying defendants' 12(b)(6) motions. Thus, although the complaint itself did not specifically allege that the church's internal governance body was not properly elected and was not following the bylaws, defendant himself raised these issues in his motion to dismiss, and plaintiffs submitted affidavits regarding these issues. *See Sutton v. Duke*, 277 N.C. 94, 102, 176 S.E.2d 161, 165 (1970) ("Under the 'notice theory of pleading' a statement of claim is adequate if it gives sufficient notice of the claim asserted 'to enable the adverse

party to answer and prepare for trial, to allow for the application of the doctrine of *res judicata,* and to show the type of case brought' " (citation omitted)); *Taylor v. Gillespie,* 66 N.C. App. 302, 305, 311 S.E.2d 362, 364, *disc. rev. denied,* 310 N.C. 748, 315 S.E.2d 710 (1984) ("A formal amendment to the pleadings 'is needed only when evidence is objected to at trial as not within the scope of the pleadings.' . . . Because no objection was made to the introduction of the evidence, the pleadings were amended by implication." (citations omitted)) Moreover, as plaintiffs allege in their complaint that defendant misappropriated funds and acted without proper authorization in spending church funds, whether or not the internal governance of the church was followed is an essential issue in determining whether or not the use of the funds was "authorized." These matters are clearly before the Court.

As I believe the courts can resolve plaintiffs' claims by applying neutral principles of law and without impermissibly entangling themselves in ecclesiastical issues in violation of the First Amendment, I conclude that the Court of Appeals correctly dismissed the appeal as interlocutory. In so concluding, I also note that this Court has previously twice dismissed defendant's notice of appeal to this Court on the basis that this appeal lacks a substantial constitutional question. 360 N.C. 576, 635 S.E.2d 599 (2006); 360 N.C. 175, 626 S.E.2d 297 (2005). Furthermore, I reiterate that defendant seeks to have this case dismissed under Rule 12(b)(1) for lack of subject matter jurisdiction. The majority argues that if this case is allowed to proceed, defendant's First Amendment rights will be irreparably injured because the court would become entangled in ecclesiastical matters from which it should have abstained. The majority cites no law and gives no concrete explanation for the proposition that allowing this case to proceed beyond a Rule 12 motion affects a substantial right which will be irreparably lost if the case proceeds. The majority asserts that the trial court "properly opened its door to this church property dispute," and that "once it became clear that no neutral principles of law existed to resolve plaintiffs' lawsuit, continued involvement by the trial court became unnecessary and unconstitutional." As discussed above, I do not believe that this case, as pleaded, involves any ecclesiastical or doctrinal disputes and, to the contrary, it appears that the property dispute at issue can be resolved using neutral principles of law. I believe, as did the Supreme Court of Alabama in *Abyssinia,* that "[p]laintiffs are entitled to present evidence as to the proper established procedures of the [church]." 340 So.2d at 748.

IN RE R.L.C.

[361 N.C. 287 (2007)]

For the reasons discussed above, I respectfully dissent and would affirm the Court of Appeals.

Justice TIMMONS-GOODSON joins this dissenting opinion.