Kane v. Moore, 2018 NCBC 120.

| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| | SUPERIOR COURT DIVISION |
| WAKE COUNTY | 17-CVS-13761 |

JOHN McCORMICK KANE,
MICHAEL PATRICK O'DONNELL,
and SKELTON & ASSOCIATES,
LP, derivatively on behalf of
LOOKOUT CAPITAL, LLC,
LOOKOUT CAPITAL BETA
INVESTMENT, LLC, LC GAMMA,
LLC, LC DELTA INVESTMENT,
LLC, LC EPSILON INVESTMENT,
LLC, LC ETA INVESTMENT I,
LLC, LC THETA INVESTMENT,
LLC, LC THETA INVESTMENT II,
LLC, and LC CAPITOLA
INVESTMENT, LLC,

                Plaintiffs,

      v.

WILLIAM M. MOORE, W.
MERRETTE MOORE, and
TIDEWATER EQUITY PARTNERS,
LLC,

                Defendants,

        and

LOOKOUT CAPITAL, LLC,
LOOKOUT CAPITAL BETA
INVESTMENT, LLC, LC GAMMA,
LLC, LC DELTA INVESTMENT,
LLC, LC EPSILON INVESTMENT,
LLC, LC ETA INVESTMENT I,
LLC, LC THETA INVESTMENT,
LLC, LC THETA INVESTMENT II,
LLC, and LC CAPITOLA
INVESTMENT, LLC,

                Nominal Defendants.

**ORDER AND OPINION ON
DEFENDANTS' MOTION TO
DISMISS PURSUANT TO RULE
12(B)(1)**

THIS MATTER comes before the Court on Defendants' Rule 12(b)(1) Motion to

Dismiss Verified Amended Complaint. ("Rule 12(b)(1) Motion", ECF No. 40.)

Defendants contend that Plaintiffs John McCormick Kane ("Kane"), Michael Patrick

O'Donnell ("O'Donnell"), and Skelton & Associates, LP ("Skelton") lack standing to pursue the derivative claims they have made in this lawsuit and that, therefore, the Court lacks subject matter jurisdiction and the claims must be dismissed. (*Id.* at pp. 2–3.)

THE COURT, having considered the Motion, the briefs filed in support of and in opposition to the Motion, the arguments of counsel at the hearing, and other appropriate matters of record, CONCLUDES that the Motion should be GRANTED, in part, and DENIED, in part, in the manner and for the reasons set forth below.

> *Ellis & Winters LLP, by Kelly Margolis Dagger and Paul K. Sun, for Plaintiffs John McCormick Kane and Michael Patrick O'Donnell.*
>
> *Ward and Smith, P.A., by Gary J. Rickner and Marla S. Bowman for Defendants William M. Moore and W. Merrette Moore.*
>
> *Parry Tyndall White, by K. Alan Parry and Michelle M. Walker for Defendant Tidewater Equity Partners, LLC.*

McGuire, Judge.

## I.  FACTS AND PROCEDURAL BACKGROUND

1. In deciding a motion under North Carolina Rule of Civil Procedure 12(b)(1), N.C. Gen. Stat. § 1A-1, Rule 12(b)(1) (hereinafter "Rule(s)"), the Court can consider matters outside of the pleadings. *Harris v. Matthews*, 361 N.C. 265, 271, 643 S.E.2d 566, 570 (2007). Plaintiffs and Defendants have filed with the Court affidavits and other evidence. The facts recited herein are drawn from the Verified Amended Derivative Complaint ("VADC"), (Ver. Am. Deriv. Compl., ECF No. 36), the Affidavit of Merrette Moore (M. Moore Aff., ECF No. 23.2), the Supplemental

Affidavit of Merrette Moore (Supp. M. Moore Aff., ECF No. 41.1), and the Affidavit of Michael Patrick O'Donnell (ECF No. 49.2).

A. The Parties

  *i. Lookout, the Moores, and the Investment Entities*

2. Nominal Defendant Lookout Capital, LLC ("Lookout") is a Delaware limited liability company ("LLC") formed on March 10, 2010, by Defendants William M. Moore ("Bill Moore") and W. Merrette Moore ("Merrette Moore") (collectively, Bill Moore and Merrette Moore are referred to as "the Moores"). Lookout is a private equity firm that sought investment opportunities in North Carolina and the Southeastern United States for its members. (ECF No. 36, at ¶¶ 25–26.) The Moores were members of Lookout at all times relevant to this case and were the sole managers of Lookout. (*Id.* at ¶¶ 19, 20.)

3. Lookout's business model required each member to commit to making an annual capital contribution to Lookout ("Annual Contribution"), typically for five years. (*Id.* at ¶ 27.) The Annual Contribution gave the member the right to invest a proportionate amount of additional money during that year into investment opportunities presented to them by Lookout. (*Id.* at ¶ 28.) Members chose whether to "opt in" or "opt out" of each proposed investment presented by Lookout. (*Id.* at ¶ 30.)

4. Lookout itself did not invest in any of the investment opportunities it found for its members. (ECF No. 23.2, at ¶¶ 7, 15.) The Annual Contributions were used solely to fund Lookout's operations in identifying and investigating potential

investment opportunities. (*Id.* at ¶¶ 7, 14.) All investment funds were provided by Lookout's individual members.

5. Once Lookout committed to a particular opportunity, it created a separate LLC exclusively for the purpose of collecting the Lookout members' investment funds and purchasing and retaining the ownership interest in the associated business. (ECF No. 36, at ¶ 34.) Nominal Defendants Beta Investment, LLC ("Beta"), LC Gamma, LLC ("Gamma"), LC Delta Investment, LLC ("Delta"), LC Epsilon Investment, LLC ("Epsilon"), LC Eta Investment, I, LLC ("Eta I"), LC Theta Investment, LLC ("Theta"), LC Theta Investment II, LLC ("Theta II"), and LC Capitola Investment, LLC ("Capitola") (collectively the "Investment Entities") are the LLCs formed for the separate investments. The Investment Entities are North Carolina limited liability companies with their principal places of business in Raleigh, North Carolina. (*Id.* at ¶¶ 11–18.) Each of the Investment Entities has the same office location and mailing address, and had either Merrette Moore or Lookout listed as the registered agent and sole manager of the LLC in their respective operating agreements and/or public filings. (*Id.* at ¶¶ 37, 40.)

ii. *Kane*

6. Kane became employed with Lookout in April 2012 as an associate and later held the positions of Director of Investor Relations and Operating Partner. (*Id.* at ¶¶ 1, 57.) Kane was responsible for recruiting new members for Lookout and was paid a commission for each new member who joined Lookout. (ECF No. 23.2, at ¶¶ 33–35.)

7.    Kane became a member of Lookout in March 2013.  (ECF No. 23.2, at ¶ 37.)  Kane committed to make Annual Contributions of $1,000 per year for five years.  (*Id*.)  Kane did not make the Annual Contributions in 2015, 2016, and 2017.  (*Id*. at ¶ 38.)  Kane made investments in and is a member of Gamma, Delta, Eta I, and Theta.  (ECF No. 36, at ¶ 2.)  Kane is not alleged to be a member of Beta, Epsilon, Theta II, or Capitola.

8.    In 2016, Kane got into a dispute with the Moores over business-related issues.  (ECF No. 23.2, at ¶¶ 39–42.)  On December 31, 2016, Kane and the Moores entered into a "Settlement and Mutual Release Agreement."  (*Id*. at ¶ 43; the "Kane Settlement Agreement", ECF No. 23.6.)  The Kane Settlement Agreement defines the "Kane Parties" as "John M. Kane, individually, and as a member of the Lookout Entities."  (ECF No. 23.6, at p. 1.)  The "Lookout Entities" are defined in the Kane Settlement Agreement to include Lookout, Beta, Gamma, Delta, Epsilon, Eta I, Theta, Capitola, and Theta II.  (*Id*.)  The Lookout Entities are also included within the definition of the "Lookout Parties," which also includes the Moores.  The Kane Settlement Agreement contains the following release of claims:

> Each of the Kane Parties hereby irrevocably releases, acquits, and forever discharges each of the Lookout Parties and its predecessors, successors, investors, shareholders, licensees, directors, officers, agents, partners, representatives, affiliates, attorneys, employees, managers, members, subsidiaries, parents, heirs and assigns, from any and all actions, causes of action, claims, demands, liabilities, expenses, court costs, expert costs, interest costs, attorneys' fees, and damages of any kind whatsoever, whether known or unknown, arising out of or in any way relating to any conduct by the Lookout Parties that occurred from the beginning of time to the date of full

execution of this Settlement Agreement and relating to or arising out of the business relationship between the Contracting Parties. Notwithstanding the foregoing, the Kane Parties do not release the Lookout Parties from any obligation expressly created in or by this Settlement Agreement.

(*Id.* at p. 2.)

### iii. O'Donnell

9. O'Donnell became a member of Lookout in June 2013 and committed to make Annual Contributions of $10,000 per year for five years. (ECF No. 23.2, at ¶ 45.) O'Donnell did not make the Annual Contributions in 2016 and 2017. (*Id.* at ¶ 51.) O'Donnell invested in and is a member of Gamma, Eta I, and Theta. O'Donnell is not a member of Beta, Delta, Epsilon, Theta II, or Capitola. (ECF No. 36, at ¶ 4; O'Donnell Aff., ECF No. 49.2, at ¶ 2.)

10. O'Donnell also worked for Lookout for a short period as Director of Investment Management until around April 2016. (ECF No. 23.2, at ¶¶ 47, 50.)

11. After separating from employment with Lookout, O'Donnell formed Hawthorne Capital Partners, LLC ("Hawthorne"), a private equity firm, in January 2016. (ECF 23.2, at ¶¶ 44, 52.) After entering into the Kane Settlement Agreement, Kane joined Hawthorne. (*Id.* at ¶ 30.)

### iv. Skelton

12. In addition to being a member of Lookout, Skelton invested in and is a member of Beta, Gamma, Delta, and Eta I. Skelton is not alleged to be a member of Epsilon, Theta, Theta II, or Capitola. (ECF No. 36, at ¶ 9.)

v.  *Tidewater*

13.  In or around May 2016, Merrette Moore formed Tidewater Equity Partners, LLC ("Tidewater") while he was still serving as a manager of Lookout. (ECF No. 36, at ¶ 81.)  Tidewater is a North Carolina LLC.  (ECF No. 23.2, at ¶ 56.)  The Moores are members of Tidewater and Merrette Moore is the manager of Tidewater.  (ECF No. 36, at ¶ 85; ECF No. 41.1, at ¶ 17.)  Plaintiffs allege that Tidewater competes with Lookout in the private equity market.  (ECF No. 36, at ¶ 81.)  Plaintiffs further allege upon information and belief that Merrette Moore formed Tidewater with the intention of replacing Lookout.  (*Id.* at ¶ 95.)

14.  Lookout's Operating Agreement ("Operating Agreement") permits its members to "engage in and possess an interest in other business ventures . . . including, without limitation, the ownership, development, and management of other similar or competitive ventures."  (*Id.* at ¶ 82.)  However, the Operating Agreement requires Lookout's managers, including Merrette Moore, to act "in the best interests of Lookout, resolve all conflicts of interest in favor of Lookout, and refrain from any action that materially and adversely affects Lookout's members."  (*Id.*)

15.  Merrette Moore has allegedly recruited a number of former and current Lookout members to invest in Tidewater.  However, Plaintiffs allege that "Lookout members who are on poor personal terms with the Moores or have previously criticized the Moores' management of Lookout, including Kane and O'Donnell, have not been invited to participate in Tidewater."  (*Id.* at ¶ 92.)

B. Plaintiffs' Allegations and Pre-Suit Demand

16.     Plaintiffs allege, *inter alia*, that the Moores, and particularly Merrette Moore: mismanaged Lookout, breached the Operating Agreement, and breached fiduciary duties to Lookout (ECF No. 36, at ¶¶ 136–41, 154–76); mismanaged and breached fiduciary duties owed to the Investment Entities (*Id.* at ¶¶ 142–53); and breached fiduciary duties to Lookout by forming Tidewater (*Id.* at ¶¶ 93, 94, 96, 98–135).

17.     On August 25, 2017, counsel for Kane and O'Donnell sent a letter to Lookout and the Moores. (ECF No. 49.2 at Ex. A ("Demand Letter").) The Demand Letter claimed that counsel represented a "group of investors and Members in Lookout," but expressly identified only Kane and O'Donnell as the members. (*Id.* at Ex. A, p. 1.) The Demand Letter states that it is a demand, pursuant to Delaware law, that "Lookout take corrective action as described herein." (*Id.*) The Demand Letter details numerous alleged violations of the Operating Agreement and of the Moores' duties to Lookout, and makes demands for corrective action. (*Id.* at Ex. A, pp. 1–10.) The Demand Letter does not expressly name any of the Investment Entities.

18.     On November 13, 2017, Kane and O'Donnell initiated this action by filing a Verified Derivative Complaint ("VDC"). (ECF No. 3.) The VDC made claims "derivatively on behalf of [Lookout]," against the Moores and Tidewater, and named Lookout as a nominal defendant. (*Id.* at p. 1.) The VDC did not include Skelton as a Plaintiff, nor did the VDC make claims on behalf of the Investment Entities.

19. On March 7, 2018, Plaintiffs filed the VADC. The VADC added Skelton as a Plaintiff and made claims derivatively on behalf of Lookout and the Investment Entities against the Moores for: breach of fiduciary duty under 6 Del. C. § 18-1104 (ECF No. 36, at ¶¶ 177–85); breach of operating agreement under 6 Del. C. § 18-101 (*Id.* at ¶¶ 186–91); breach of implied covenant of good faith and fair dealing (*Id.* at ¶¶ 192–98); and waste of corporate assets (*Id.* at ¶¶ 209–16). Plaintiffs also brought claims against Tidewater for aiding and abetting breach of fiduciary duty (*Id.* at ¶¶ 199–208), tortious interference with contract (*Id.* at ¶¶ 217–27), and tortious interference with prospective economic advantage (*Id.* at ¶¶ 228–36). Plaintiffs brought a claim against all Defendants for unfair and deceptive trade practices pursuant to N.C. Gen. Stat. § 75-1 (hereinafter the North Carolina General Statutes are referred to as "G.S.") (*Id.* at ¶¶ 237–45). Plaintiffs also made a claim in the alternative against Merrette Moore and Tidewater for unjust enrichment. (*Id.* at ¶¶ 246–57.) The VADC added the Investment Entities as nominal Defendants.

20. On March 16, 2018, Defendants filed the Rule 12(b)(1) Motion, along with a brief in support of their 12(b)(1) Motion. (Br. Supp. Rule 12(b)(1) Motion, ECF No. 41.) Plaintiffs filed a Brief in Opposition to the Rule 12(b)(1) Motion. (ECF No. 50.) Defendants filed a Reply Brief in Support of the Rule 12(b)(1) Motion. (ECF No. 54.) The Court held a hearing on the Rule 12(b)(1) Motion, and it is ripe for disposition.

## II.    ANALYSIS

21.    Defendants move to dismiss all claims in this lawsuit on the grounds that Plaintiffs lack standing to pursue derivative claims on behalf of the Investment Entities and on behalf of Lookout. Defendants contend that Plaintiffs, collectively, lack standing to bring derivative claims on behalf of Epsilon, Theta II, and Capitola because none of the three Plaintiffs are members of those three companies, and Plaintiffs lack standing to pursue claims for the remaining Investment Entities because Plaintiffs did not make a pre-suit demand on the Investment Entities. (ECF No. 40, at pp. 1–2.)

22.    Defendants also contend that Plaintiffs, collectively, lack standing to bring derivative claims on behalf of Lookout because: (a) Kane released all claims he had against the Moores and their affiliates in the Kane Settlement Agreement; (b) Kane's and O'Donnell's ownership interests in Hawthorne create a conflict of interest with other Lookout members; (c) Kane and O'Donnell have personal animus towards the Moores; and (d) Skelton lacks standing to pursue derivative claims on behalf of Lookout because Skelton made no pre-suit demand upon Lookout. (*Id.*) The Court will address these contentions in turn.

### A. Legal Standard for Rule 12(b)(1)

23.    "If a party does not have standing to bring a claim, a court has no subject matter jurisdiction to hear the claim." *Estate of Apple v. Commercial Courier Express Inc.*, 168 N.C. App. 175, 177, 607 S.E.2d 14, 16 (2005). "Standing concerns the trial court's subject matter jurisdiction and is therefore properly challenged by a Rule

12(b)(1) motion to dismiss." *Fuller v. Easley*, 145 N.C. App. 391, 395, 553 S.E.2d 43, 46 (2001); s*ee also, Aubin v. Susi*, 149 N.C. App. 320, 324, 560 S.E.2d 875, 878 (2002) ("Standing is a necessary prerequisite to a court's proper exercise of subject matter jurisdiction."). "A motion to dismiss for lack of subject matter jurisdiction is not viewed in the same manner as a motion to dismiss for failure to state a claim upon which relief can be granted." *Tart v. Walker*, 38 N.C. App. 500, 502, 248 S.E.2d 736, 737 (1978). In addressing a Rule 12(b)(1) challenge, the Court is not limited to a plaintiff's allegations, and may consider matters outside the pleadings. *Harris,* 361 N.C. at 271, 643 S.E.2d at 570; *see also, Keith v. Wallerich*, 201 N.C. App. 550, 554, 687 S.E.2d 299, 302 (2009).

B. <u>Plaintiffs Do Not Have Standing to Sue on Behalf of Epsilon, Theta II, and Capitola Because Plaintiffs Are Not Members of Those Investment Entities</u>.

24. Defendants argue that none of the Plaintiffs are members of Epsilon, Theta II, and Capitola, and therefore, Plaintiffs lack standing to sue on behalf of those companies. (ECF No. 41, at pp. 20–21.)

25. The named investment entities are North Carolina LLCs. Pursuant to G.S. § 57D-8-01(a), a plaintiff purporting to bring derivative claims on behalf of a North Carolina LLC must be a member of that LLC "at the time the act or omission for which the proceeding is brought" occurred, or if "all or any portion of the member's ownership interest devolve[d] by operation of law from an ownership interest that was owned by a member at that time."

26. It is undisputed that Plaintiffs are not members, and have never been members, of Epsilon, Theta II, or Capitola. Accordingly, the Rule 12(b)(1) Motion to

dismiss Plaintiffs' derivative claims on behalf of Epsilon, Theta II, and Capitola should be GRANTED and such derivative claims should be DISMISSED without prejudice.

C. <u>Plaintiffs Failed to Make a Proper Pre-suit Demand on Behalf of the Investment Entities</u>.

27. Defendants further argue that Plaintiffs cannot make derivative claims on behalf of the remaining Investment Entities because Plaintiffs did not make an adequate demand on the Investment Entities as required by G.S. § 57D-8-01(2). (ECF No. 41, at pp. 21–23.) Each of the Investment Entities is a North Carolina LLC. A member of a North Carolina LLC can bring a derivative action only if the "member made written demand on the LLC to take suitable action, and either (i) the LLC notified the member that the member's demand was rejected, (ii) 90 days have expired from the date the demand was made, or (iii) irreparable injury to the LLC would result by waiting for the expiration of the 90-day period." G.S. § 57D-8-01(2); *Azure Dolphin, LLC v. Barton*, 2017 NCBC LEXIS 90, at *20 (N.C. Super. Ct. Oct. 2, 2017) ("A party's standing to bring derivative claims depends on compliance with the demand requirement in [G.S.] § 57D-8-01(a)(2)" (internal quotation marks omitted).) (citing *Petty v. Morris*, 2014 NCBC LEXIS 67, at *4 (N.C. Super. Ct. Dec. 16, 2014).

28. The pre-suit demand required by section 57D-8-01(a) "must be made with sufficient clarity and particularity to permit the corporation . . . to assess its rights and obligations and determine what action is in the best interest of the company." *Miller v. Burlington Chem. Co.*, 2017 NCBC LEXIS 6, at *29 (N.C. Super.

Ct. Jan, 27, 2017) (quoting *Garlock v. Hilliard*, 2000 NCBC LEXIS 6, at *9 (N.C. Super. Ct. Aug. 22, 2000)).

> [T]he Court must [ ] determine whether the Demand Letter constituted a proper demand to take suitable action so as to satisfy the demand requirement. In so doing, the Court must compare the derivative claims asserted in a complaint against the specific demands a plaintiff has made prior to filing suit.

*Id.* at *30 (quotation marks omitted).

29. Preliminarily, Plaintiffs do not explicitly allege that they made a pre-suit demand on any entity other than Lookout in the VADC. (ECF No. 36, at ¶ 24.) In addition, Plaintiffs do not allege any wrongful conduct directed specifically at the Investment Entities by the Moores or Tidewater in their nine causes of action. (ECF No. 36, at ¶¶ 177–257.) Rather, all of the wrongful conduct is alleged to have been taken against or with regard to Lookout. (*Id.*)

30. The Demand Letter itself is directed to, and discusses, only Lookout: none of the Investment Entities are mentioned by name. The Demand Letter is titled "Re: Mismanagement of Lookout Capital, LLC[,] Demand for Corrective Action Under 6 Del. C. § 18-1003 and Ct. Ch. R. 23.1[.]" (ECF No. 49.2 at Ex. A, p. 6.) Lookout is the only Delaware LLC in this action, and any demand upon the Investment Entities would properly be made under North Carolina law. In the Demand Letter Kane and O'Donnell are identified as "Members in Lookout" and not as members of any Investment Entities. (*Id.*) The Demand Letter references and quotes only the Lookout Operating Agreement, and not any of the Investment Entities' operating agreements, (*Id.* at pp. 2–3), and cites only the Delaware Limited Liability Company

Act and corresponding case law from Delaware in support of its claims. (*Id.* at pp. 4–5.) Finally, the Demand Letter demands "that Lookout take corrective action," and does not expressly demand that the Investment Entities take any action. (*Id.* at pp. 1, 9.)

31.     Plaintiffs argue that "a party-by-party analysis of Plaintiffs' statutory standing and demand requirements is not necessary, [because Plaintiffs] have alleged . . . that the [Investment Entities] are mere instrumentalities of Lookout," and that their pre-suit demand upon Lookout should satisfy the statutory requirement for a demand upon each of the Investment Entities. (ECF No. 49, at pp. 22–26.)

32.     Under North Carolina law, a "corporation which exercises actual control over another, operating the latter as a mere instrumentality or tool, is liable for the torts of the corporation thus controlled. In such instances the separate identities of parent and subsidiary or affiliated corporations may be disregarded." *Glenn v. Wagner*, 313 N.C. 450, 454, 329 S.E.2d 326, 330 (1985); *see also, Henderson v. Security Mortg. & Finance Co.*, 273 N.C. 253, 260, 160 S.E.2d 39, 44 (1968). However, "[a] corporation's separate and independent existence is not to be disregarded lightly," and should be a "rare" occurrence. *State ex rel. Cooper v. Ridgeway Brands Mfg., LLC*, 362 N.C. 431, 438-439, 666 S.E.2d 107, 112 (2008) (quotations and citations omitted).

33.     To invoke the mere instrumentality theory a plaintiff must prove: (1) control that rises to the level of "complete domination, not only of finances, but of

policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own[;]" (2) the use of such control by the defendant "to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights[;]" and (3) that such control and breach of duty proximately caused injury. *Glenn*, 313 N.C. at 455, 329 S.E.2d at 329 (internal citations and quotations omitted). The most commonly recognized application of the instrumentality rule is when courts disregard the corporate form to pierce the corporate veil, "and extend liability for corporate obligations beyond the confines of a corporation's separate entity whenever necessary to prevent fraud or to achieve equality." *Id.* at 454, 329 S.E.2d at 330.

34. Defendants have presented unrebutted evidence that the Investment Entities are not subsidiaries of Lookout, but instead are separately-formed North Carolina LLCs and that Lookout has no ownership interest in the Investment Entities. (ECF No. 41.1, at ¶¶ 5–6; Lookout Op. Ag., ECF No. 23.2, at ¶¶ 15–20.)

35. Nevertheless, Plaintiffs claim that the Investment Entities "are, as a practical matter, subsidiaries of Lookout and are controlled by the Moores through Lookout" and "were established not for the purpose of forming new and separate companies, but merely to mechanically facilitate Lookout's investments." (ECF No. 36, at ¶¶ 36, 41.) In support of this claim, Plaintiffs allege that: Merrette Moore or Lookout is the manager and registered agent of each of the Investment Entities (*Id.* at ¶ 37); the Investment Entities share the same office location and mailing address

(*Id.* at ¶ 40); Merrette Moore has frequently used Lookout's name, letterhead, and newsletter to disseminate information regarding the Investment Entities (*Id.* at ¶ 38); and Lookout has paid expenses for the Investment Entities including costs of tax preparation and filings with the Secretary of State (*Id.* at ¶ 39).

36.     Plaintiffs have not cited, and the Court has not found, any reported North Carolina cases applying the mere instrumentality/alter ego theory to relieve a plaintiff from making a statutorily-required derivative demand on a corporation because that corporation is alleged to be dominated and controlled by another corporation.

37.     Ultimately, even if the mere instrumentality theory could be applied to decide the adequacy of a derivative demand, the Court finds that Plaintiffs have not pleaded facts sufficient to support an allegation that Lookout or the Moores exercised "complete domination" of the Investment Entities such that they had "no separate mind, will or existence of [their] own." *Glenn*, 313 N.C. at 455, 329 S.E.2d at 330. While Plaintiffs allege that Merrette Moore was the manager of both Lookout and the Investment Entities, and that Merrette Moore managed the business of all of the entities from a single location, these facts, even if true, would not warrant disregarding the corporate forms of the various companies. *See, Sprouse v. North River Ins. Co.*, 81 N.C. App. 311, 319, 344 S.E.2d 555, 561 (1986) (refusing to "disregard the existence of the two corporations and treat them as a single entity for purposes of this litigation" even though "[i]t does appear that the two corporations are controlled by substantially the same officers"); *Blue Ridge Pediatric & Adolescent*

*Medicine, Inc. v. First Colony Healthcare, LLC,* 2012 NCBC LEXIS 52, at *15–16 (N.C. Super. Ct. Oct. 3, 2012) ("While Plaintiffs allege that numerous affiliates occupy the same office, share the same employees, and are insolvent . . . . these allegations merely establish a working relationship, rather than outlining the requisite control and domination to substantiate this claim.").

38. The Court concludes that Plaintiffs have not alleged that they made a proper demand for corrective action on the Investment Entities as required by G.S. § 57D-8-01(a)(2). The VADC alleges only that Plaintiffs made a demand on Lookout. In addition, the Demand Letter does not contain any explicit claims regarding the Investment Entities, nor a demand that the Investment Entities take corrective action. *See Miller*, 2017 NCBC LEXIS 6, at *32–34 (holding a demand letter's failure to mention the specific breaches of fiduciary duty alleged by plaintiff in the complaint fatal to plaintiff's derivative claims).

39. Therefore, Plaintiffs' derivative claims on behalf of the Investment Entities should be dismissed. The Rule 12(b)(1) Motion to dismiss Plaintiffs' derivative claims on behalf of Beta, Gamma, Delta, Eta I, and Theta should be GRANTED, and such derivative claims should be DISMISSED without prejudice.

D. <u>Kane Released All Derivative and Direct Claims Against Lookout and the Moores for Conduct Occurring Prior to December 31, 2016.</u>

40. Defendants argue that Kane lacks standing to sue on behalf of Lookout because he released all claims against the Moores and Lookout, both individual and derivative, in the Kane Settlement Agreement. In the Kane Settlement Agreement, Kane, individually and as a member of Lookout and the Investment Entities, released

Lookout, the Investment Entities, and the Moores from any and all claims and damages, known or unknown, arising in any way out of conduct on behalf of or due to association with Lookout. (ECF No. 23.6, at p. 2.) The Kane Settlement Agreement was effective December 31, 2016. (ECF No. 23.2, at ¶ 43.)

41. A release "operates as a merger of, and bars all right to recover on, the claim or right of action" covered by the release. *Fin. Servs. of Raleigh, Inc. v. Barefoot*, 163 N.C. App. 387, 392, 594 S.E.2d. 37, 41 (2004) (citing *Jenkins v. Fields*, 240 N.C. 776, 778, 83 S.E.2d 908, 910 (1954)). However, a release generally bars only those claims in existence at the time it is executed, and not claims accruing after the execution of the release. *Travis v. Knob Creek, Inc.*, 321 N.C. 279, 282, 362 S.E.2d 277, 279 (1987) (analyzing a release agreement pursuant to the "general rule" that "[a] release ordinarily operates on the matters expressed therein which are already in existence at the time of the giving of the release"); *see also Sims v. Gernandt*, 341 N.C. 162, 164–65, 459 S.E.2d 258, 259–60 (1995) (stating the same general rule, and distinguishing plaintiff's case from that in *Travis* because plaintiff's claim against defendant had accrued when she signed the release); *Fin. Servs. of Raleigh, Inc.*, 163 N.C. App. at 393–94, 594 S.E.2d at 41–42 (quoting *Travis* and *Sims*, and stating that those cases "reflect the general rule that a general release cannot be held to bar a claim which did not exist when it was signed" (internal quotation marks omitted)).

42. The Court has reviewed the release and the arguments made by counsel and concludes that the broad release language covers Kane's derivative claims accruing on or before December 31, 2016 against the Moores, Lookout, and its

affiliates. *Shaw v. Gee*, 2016 NCBC LEXIS 103, at \*9 (N.C. Super. Ct. Dec. 21, 2016) (holding that a release signed by plaintiff "to the extent he is a member, stakeholder, or holds an interest in any entity identified herein" was intended to cover all ownership interests in the LLC to which plaintiff was a member, including the right to bring derivative actions).

43. Plaintiffs contend that even if Kane released his claims against Lookout and the Investment Entities, he has not released claims against Tidewater. Defendants argue that Kane released Lookout, the Moores, and their "affiliates" in the Kane Settlement Agreement, and that Tidewater is an affiliate company of Lookout and of the Moores. (ECF No. 54, at p. 2.) Defendants cite *Procar II, Inc. v. Dennis*, 218 N.C. App. 600, 601–02, 721 S.E.2d 369, 370–71 (2012), in which the Court of Appeals adopted the definition of "affiliate" from *Black's Law Dictionary*: "a corporation that is related to another corporation by shareholding or other means of control: a subsidiary, parent or sibling corporation." *Id*. at 601, 721 S.E.2d at 370. Relying on this definition, the Court of Appeals held that two companies that were owned and controlled by a single individual were "affiliates." *Id*. at 601–02, 721 S.E.2d at 370–71.

44. The Court finds that Tidewater was an affiliate of Lookout and of the Moores within the meaning of the Kane Settlement Agreement. Plaintiffs concede that both Tidewater and Lookout are owned by the Moores, controlled by Merrette Moore, and are related "by shareholding or other means of control." *Id*. at 601, 721 S.E.2d at 370. In addition, Tidewater was formed in or around May 2016, and was

in existence when Kane executed the Kane Settlement Agreement in December 2016. Even if Kane was not aware of Tidewater at the time he entered into the Kane Settlement Agreement, Kane released all claims "whether known or unknown." *See Merrimon v. Postal Telegraph-Cable Co.*, 207 N.C. 101, 105–06, 176 S.E. 246, 248 (1934) (recognizing that "[t]he language in a release may be broad enough to cover all demands and rights to demand or possible causes of action . . . whether or not the various demands or claims have been discussed or mentioned, and whether or not the possible claims are all known"); *Talton v. Mac Tools, Inc.*, 118 N.C. App. 87, 90–91, 453 S.E.2d 563, 565 (1995) ("Since this language was broad enough to cover all possible causes of action, whether or not the possible claims are all known, plaintiffs cannot rely on their ignorance of facts giving rise to a claim for fraud as a basis for avoiding the release.").

45. Kane cannot pursue claims individually or as a member of Lookout or any of the Investment Entities for any conduct occurring prior to December 31, 2016, which includes many, if not most, of the allegations of mismanagement of Lookout and allegations surrounding the formation of Tidewater.

E. O'Donnell, but not Kane, is an Adequate Representative of Lookout's Members for the Purpose of Making Derivative Claims.

46. Defendants argue that Kane and O'Donnell lack standing to bring derivative claims on behalf of Lookout because they cannot fairly or adequately protect the interests of Lookout and all its members. (ECF No. 41, at p. 15.)

Defendants do not challenge Kane's and O'Donnell's standing to bring derivative claims on behalf of Lookout on any other grounds.[1]

47.    Under the "internal affairs doctrine," which both North Carolina and Delaware recognize, only the state of organization can exercise authority to regulate "matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders." *Bluebird Corp. v. Aubin*, 188 N.C. App. 671, 680, 657 S.E.2d 55, 63 (2008) (citation omitted); *see also Pyott v. La. Mun. Police Emps.' Ret. Sys.*, 74 A.3d 612, 616 (Del. 2013).  This principle has been codified in the North Carolina Limited Liability Company Act, which states that "[i]n any derivative proceeding in the right of a foreign LLC, the matters covered by this Article will be governed by the law of the jurisdiction of the foreign LLC's organization." G.S. § 57D-8-06.  Kane and O'Donnell's adequacy as derivative representatives for Lookout, a Delaware LLC, must be analyzed under Delaware law.

48.    Delaware law requires that "[a]n action brought by or against the members of an unincorporated association as a class by naming certain members as representative parties may be maintained only if it appears that the representative parties will fairly and adequately protect the interests of the association and its members." Del. Ch. Ct. R. 23.2 (emphasis added); *see also Youngman v. Tahmoush*, 457 A.2d 376, 379 (Del. Ch. 1983) ("[T]he plaintiff in a derivative action must be

---

[1] For example, Defendants do not argue, as they do regarding Skelton, that Kane and O'Donnell have failed to adequately allege that they made a pre-suit demand for corrective action on Lookout.

qualified to serve in a fiduciary capacity as a representative of a class, whose interest is dependent upon the representative's adequate and fair prosecution.").[2]

49.    In determining whether a plaintiff has standing to bring derivative claims, Delaware courts consider eight factors: (1) economic antagonisms between the representative and the class; (2) the remedy sought by plaintiff in the derivative litigation; (3) indications that the named plaintiff was not the driving force behind the litigation; (4) plaintiff's unfamiliarity with the litigation; (5) other litigation pending between plaintiff and defendants; (6) the relative magnitude of plaintiff's personal interests as compared to her interests in the derivative action itself; (7) plaintiff's vindictiveness toward defendants; and (8) the degree of support plaintiff was receiving from the shareholders she purported to represent. *See In re Fuqua Indus., Inc. S'holder Litig.*, 752 A.2d 126, 130 (Del. Ch. 1999). The Court need not find all factors present for a finding of inadequacy, but "if a derivative plaintiff is to be disqualified by a strong showing of only one factor, that factor must involve some conflict of interest between the derivative plaintiff and the class." *Id.*

50.    The Court first will address whether Kane can be a fair and adequate representative for Lookout members in light of his release of claims. Kane has released any claims he held as a member of Lookout that accrued on or before December 31, 2016. Kane is precluded from acting as a representative in pursuing

---

[2] The Delaware Legislature has allowed derivative suits to be brought by members on behalf of limited liability companies. *See* 6 Del. C. §§ 18-1001, *et seq.* As a result, "case law governing corporate derivative suits is equally applicable to suits on behalf of an LLC." *Banyan Mezzanine Fund II v. Rowe*, 2016 NCBC LEXIS 38, *10 (N.C. Super. Ct. May 10, 2016) (quoting *VGS, Inc. v. Castiel*, 2003 Del. Ch. LEXIS 16, *43 (Del. Ch. Feb. 28, 2003).

claims, and from sharing in any recovery, arising from the many alleged acts of wrongdoing and neglect by the Moores that occurred prior to December 31, 2016. (ECF No. 36, at ¶¶ 68–72, 81, 100–06, 136, 142–47, 152, 167–76.) Therefore, Kane's interest in the claims raised on behalf of Lookout is substantially narrower than the interests of other Lookout members. While Delaware courts have recognized that a representative plaintiff's interests may be greater than those of his fellow class members, those interests must be at least coextensive with those other shareholders. *Youngman v. Tahmoush*, 457 A.2d at 380 ("The fact that the plaintiff may have interests which go beyond the interests of the class, but are *at least* co-extensive with the class interest, will not defeat his serving as a representative of the class" (emphasis added).). The conflict present here is substantial enough to preclude Kane from general representation of the derivative class in this suit, even for the limited conduct alleged to have occurred after December 31, 2016.

51. Therefore, the Court concludes that Kane will not be able to fairly and adequately protect the interests of Lookout and its members in this lawsuit. Del. Ch. Ct. R. 23.2. As a result, Defendants' motion to dismiss derivative claims brought by Kane for lack of standing is GRANTED, and those claims are DISMISSED without prejudice.

52. With regard to O'Donnell, the Court has considered the eight Delaware factors and Defendants arguments, and at this time is not persuaded that O'Donnell cannot fairly and adequately represent Lookout and its other members. There is no evidence of any conflict or "economic antagonism" between O'Donnell and Lookout or

its members. Defendants argue that O'Donnell's participation in Hawthorne, which competes with Tidewater in the private equity market, establishes a conflict of interest with regard to O'Donnell's representation of Lookout and its members. However, Defendants do not claim that Hawthorne competes with Lookout for investment opportunities. To the contrary, Defendants admit that Lookout is no longer seeking new investment opportunities and is "winding down" its operations. (ECF No. 23.2, at ¶ 28.) In addition, there is no other litigation between O'Donnell and Lookout. The Court finds there is no conflict between O'Donnell and Lookout or its members.

53. O'Donnell was an original Plaintiff in, and driving force behind, the lawsuit, and appears to be enthusiastically pursuing the litigation. (*See*, ECF No. 49.2.) Plaintiffs' evidence also indicates that the other members of Lookout generally support this lawsuit. (*Id*. at ¶¶ 10–15.)

54. In addition, most of the evidence before the Court is focused on Kane's animosity toward the Moores, not O'Donnell's. Any discord between O'Donnell and the Moores is not sufficient to preclude O'Donnell from representing Lookout and its members in this lawsuit.

55. In conclusion, the Court finds that O'Donnell is an adequate representative of Lookout members for the purpose of making derivative claims under Delaware law. Defendants' motion to dismiss Plaintiffs' claims because O'Donnell lacks standing should be DENIED.

F.  Skelton Lacks Standing to Bring Derivative Claims on Behalf of Lookout.

55.    Defendants contend that Skelton lacks standing to pursue derivative claims on behalf of Lookout because it did not make a pre-suit demand on Lookout and Plaintiffs do not allege that a demand would have been futile.  (ECF No. 41, at pp. 23–25.)  The entirety of Plaintiffs' allegations regarding the demand is as follows:

> Plaintiffs meet the conditions for bringing this derivative action pursuant to [G.S.] § 57D-8-01(a), as they were members of Lookout and its subsidiaries at all relevant times,[ ] and made a written demand on Lookout to take suitable action, which was rejected.

(ECF No. 36, at ¶ 24.)

56.    Pursuant to Delaware law, "a derivative complaint must allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors . . . and the reasons for the plaintiff's failure to obtain the action or for not making the effort."  *Hartsel v. Vanguard Grp., Inc.*, 2011 Del. Ch. LEXIS 89, at *89 (Del. Ch. Ct. June 15, 2011) (quoting Del. Ch. Ct. Rule 23.1(a)) (internal quotation marks omitted); *Kaufman v. Belmont*, 479 A.2d 282, 286 (Del. Ch. Ct. 1984); *Krieger v. Johnson*, 2014 NCBC LEXIS 13, at *13 (N.C. Super. Ct. Apr. 30, 2014).  The demand requirement under Delaware law is

> a substantive right designed to give a corporation the opportunity to rectify an alleged wrong without litigation, and to control any litigation which does arise.  Under Delaware law, a derivative plaintiff must give the board of directors the opportunity to exercise that substantive right or demonstrate that the board is incapable of evaluating [a] demand in a disinterested and independent manner, *i.e.*, because that demand would be futile.

*Braddock v. Zimmerman*, 906 A.2d 776, 784 (Del. 2006) (internal quotation marks omitted). Thus, the demand requirement is "not a mere procedural nicety," but rather it is a deliberate departure from the notice pleading standard. *Richardson v. Graves*, C.A. no. 6617, 1983 Del. Ch. LEXIS 466, at *5 (Del. Ch. Ct. June 17, 1983). "Generalities, artistically ambiguous, [or] all-encompassing conclusory allegations are not enough. What is required are pleadings that are specific and, if conclusory, supported by sufficient factual allegations that corroborate the conclusion and support the proposition that demand is futile." *Id.*

57. If the plaintiff does not make a demand prior to filing suit, the plaintiff bears the burden of alleging with particularity in the complaint the reasons why demand would have been futile. *Haber v. Bell*, 465 A.2d 353, 357 (Del. Ch. Ct. 1983). If a derivative plaintiff fails to carry his burden of alleging with particularity facts sufficient to excuse a demand, his complaint must be dismissed, even if his claim is otherwise meritorious. *Id.* "When deciding a motion to dismiss for failure to make a demand under Chancery Rule 23.1 the record before the court must be restricted to the allegations of the complaint." *Spiegel v. Buntrock*, 571 A.2d 767, 774 (Del. 1990).

58. In response, Plaintiffs first argue that Skelton was not required to make a demand because it simply joined as a plaintiff in an already-filed lawsuit and did not "commence" the action. (ECF No. 49, at pp. 27–28.) In support, Plaintiffs rely on *Wright v. Krispy Kreme Doughnuts, Inc.*, 231 F.R.D. 475 (M.D.N.C. 2005), in which the federal district court allowed a plaintiff who had not made her own separate demand to intervene in a preexisting North Carolina derivative suit filed under G.S.

§ 55-7-42 pursuant to Federal Rule of Civil Procedure 24, holding that "[b]y its own plain language, [G.S. § 55-7-42] states that '[n]o shareholder may *commence* a derivative proceeding until' demand is made. . . . The statute does not require demand to be made when a party intervenes in an otherwise ongoing derivative action." *Id.* at 479 (emphasis in original).

59. The Court is not persuaded by Plaintiffs' argument. First, Plaintiffs do not cite any Delaware authority permitting a shareholder who did not make his or her own demand on the corporation to join a derivative action that already has been filed by other shareholders. On the contrary, the Court's review of Delaware law suggests that Delaware requires even proposed permissive intervenors to comply with the demand requirements of Chancery Rule 23.1. *In re Freeport-McMoRan Copper & Gold Deriv. Litig.*, 2013 Del. Ch. LEXIS 50, at *3–4 n.7 (Del Ch. Ct. Feb. 14, 2013) ("To the extent that the Proposed Intervenors suggest that the Court has dispensed with the necessary Rule 23.1 inquiry, they are mistaken."); *Dubroff v. Wren Holdings, LLC*, 2011 Del. Ch. LEXIS 164 (Del. Ch. Ct. Oct. 28, 2011) (analyzing the nature of each claim the purported-intervenor-plaintiffs intend to bring against defendants in a preexisting action, because derivative claims require analysis of compliance with Chancery Rule 23.1 and noncompliance with Chancery Rule 23.1 is grounds for dismissal).

60. Second, in this case, unlike in *Krispy Kreme*, Skelton has not asked to permissively intervene, but instead has attempted to join the lawsuit by asserting claims as a Plaintiff in the VADC. Finally, Chancery Rule 23.1 does not contain

language similar to G.S. § 55-7-42, which ties the demand requirement strictly to shareholders who "commence a derivative proceeding." Chancery Rule 23.1 instead requires that "[t]he complaint shall [ ] allege with particularity the efforts, if any, made by *the plaintiff* to obtain the action *the plaintiff* desires from the directors or comparable authority and the reasons for *the plaintiff's* failure to obtain the action or for not making the effort." Del. Ch. Ct. R. 23.1(a) (emphasis added).

61.     Alternatively, Plaintiffs contend that Skelton "arguably" made the required demand because the Demand Letter stated that it was sent on behalf of "a group of investors and Members in Lookout . . . including but not limited to [Kane] and [O'Donnell]." (*Id*. at pp. 28–29.) Plaintiffs contend that the letter should be interpreted as having been sent on behalf of other Lookout members including Skelton. (*Id*. at p. 28.)

62.     Plaintiffs' contention that Skelton "arguably" complied with his pleading requirement because the Demand Letter purported to be on behalf of other unnamed Lookout members bears little consideration. First, the Court cannot consider the contents of the Demand Letter, which were not expressly alleged in the VADC. In deciding whether Skelton has adequately pleaded demand or futility, the Court is "restricted to the allegations of the complaint." *Spiegel*, 571 A.2d at 774. In addition, Plaintiffs have not supported their argument with legal authority from Delaware or any other jurisdiction that a demand expressly made by specific shareholders, but also purporting to be made on behalf of unnamed others, would meet the particularity requirements of Chancery Rule 23.1. Plaintiffs' argument must fail.

63.     Turning to the allegations in the VACD, Plaintiffs' allegation regarding Skelton's pre-suit demand is vague and conclusory. It does not refer to Chancery Rule 23.1 or any other Delaware law, but instead alleges only that Plaintiffs meet the demand requirement for bringing a derivative suit under North Carolina law. It does not specify the form of the purported "demand," the date of the demand, the contents of the demand, the time between Lookout's receipt of the demand and its alleged rejection of the demand or the nature of the alleged rejection, or any other details from which the Court could determine the sufficiency of the demand. Even the allegation that Plaintiffs "meet" North Carolina's demand requirements is a legal conclusion. This bare allegation when considered in isolation is insufficient for the Court to find that Skelton made an adequate demand. Allowing Skelton to proceed as a derivative plaintiff would frustrate the purpose of the strict demand requirement for derivative standing under Delaware law. Skelton also did not plead with particularity the facts that would support demand futility.

64.     Therefore, Skelton lacks standing to bring derivative claims on behalf of Lookout. Defendants' motion to dismiss derivative claims brought by Skelton for lack of standing is GRANTED, and those claims are DISMISSED without prejudice.

## III.     CONCLUSION

THEREFORE, IT IS ORDERED that:

1. The Rule 12(b)(1) Motion, to the extent is seeks dismissal of derivative claims raised on behalf of the Investment Entities, is GRANTED, and those claims are DISMISSED, without prejudice.

2. The Rule 12(b)(1) Motion, to the extent is seeks dismissal of derivative claims raised on behalf of Lookout by Kane, is GRANTED, and those claims are DISMISSED, without prejudice.

3. The Rule 12(b)(1) Motion, to the extent it seeks dismissal of derivative claims raised on behalf of Lookout by O'Donnell, is DENIED.

4. The Rule 12(b)(1) Motion, to the extent it seeks dismissal of derivative claims raised on behalf of Lookout by Skelton, is GRANTED, and those claims are DISMISSED, without prejudice.

SO ORDERED, this the 26th day of November, 2018.


    /s/ Gregory P. McGuire
Gregory P. McGuire
Special Superior Court Judge for
Complex Business Cases