IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-528

No. COA20-800

Filed 5 October 2021

Mecklenburg County, No. 19-CvS-18345

NATION FORD BAPTIST CHURCH INCORPORATED d/b/a Nations Ford
Community Church, Plaintiff,

v.

PHILLIP RJ DAVIS, Defendant/Third-Party Plaintiff,


v.

JOSEPH DIXON, CHARLES ELLIOT and DOUGLAS WILLIE, Third-Party
Defendants.

Appeal by Plaintiff/Third-Party Defendant from order entered 22 July 2020 by

Judge Carla N. Archie in Mecklenburg County Superior Court. Heard in the Court

of Appeals 10 August 2021.

> *Knox, Brotherton, Knox & Godfrey, by Lisa G. Godfrey, H. Edward Knox, and*
> *J. Gray Brotherton, for the Plaintiff- and Third-Party Defendants-Appellants.*
>
> *Nexsen Pruet, PLLC, by James C. Smith and Nicholas T. Pappayliou, for the*
> *Defendant/Third-Party Plaintiff-Appellee.*


GRIFFIN, Judge.

¶ 1        Plaintiff Nation Ford Baptist Church Incorporated (the "Church") and Third-

Party Defendants Joseph Dixon, Charles Elliot, and Douglas Willie (together, the

"Elders") appeal the trial court's order denying their motion to dismiss and granting

Defendant and Third-Party Plaintiff Phillip R.J. Davis's ("Davis") motion to amend his counterclaim and third-party complaint. The Church and the Elders argue the trial court erred in denying their motion, granting Davis's motion, and concluding Davis had standing to bring the claims asserted in his counterclaim and third-party complaint.

The primary issue presented in this appeal is whether the resolution of Davis's claims would require our Courts to interpret religious matters in violation of the ecclesiastical abstention doctrine which stems from the First Amendment to the United States Constitution. We hold that there is no guarantee that our Courts will be forced to weigh ecclesiastical matters at this stage of the proceedings. We affirm the decision of the trial court.

## I.    Factual and Procedural History

The Church was incorporated as a North Carolina nonprofit corporation in 1988. At the Church's time of incorporation, the Elders acted as the Board of Directors for the Church. On 31 March 2016, the Elders hired Davis to serve as Senior Pastor for the Church. Davis was employed on an "'at-will' basis." The employment agreement letter signed by Davis on 31 March 2016 set out his terms of employment, in pertinent part, as follows:

> An "at-will" employment relationship has no specific duration. This means that an employee can resign their employment at any time, with or without reason or

advance notice. *The [C]hurch has the right to terminate employment at any time, with or without reason or advance notice as long as there is no violation of applicable state or federal law.*

(Emphasis added).

¶ 4 The Record in this case contains two different sets of bylaws, and the parties disagree which bylaws governed the Church's operations during the time relevant to this case. The Church adopted a set of bylaws ("the First Bylaws") on 8 January 1997. On or about April 2008, the Church applied for a bank loan, and incorporated another set of bylaws ("the Second Bylaws") as part of its loan application.

¶ 5 Effective 17 June 2019, the Elders unanimously decided to terminate Davis's employment at the Church. Despite his termination, Davis ignored the instructions of the Church and continued to conduct religious activities at the Church.

¶ 6 The Church initiated this action on 17 September 2019 seeking, *inter alia*, a preliminary injunction to prohibit Davis from accessing the Church. In response, Davis filed an answer, counterclaim, third-party complaint, and motion for injunctive relief on 24 October 2019. Davis's claims are centered around an employment dispute for which the remedy is dependent upon determining which bylaws governed the Church's actions. An order granting the Church's motion for a preliminary injunction was entered on 30 October 2019.

¶ 7 On 22 April 2020, the Church and the Elders filed a motion to dismiss Davis's

counterclaim and third-party complaint. Davis moved to amend his answer, counterclaim, and third-party complaint on 6 May 2020. The court entered an order ("the Order") granting Davis's motion to amend and denying the Church and the Elders' motion to dismiss on 22 July 2020. According to the Order,

> The [c]ourt finds and concludes that (i) this [c]ourt has subject matter jurisdiction over the matters and claims asserted in [Davis]'s Counterclaim and Third-Party Complaint, (ii) [Davis] has standing to bring the claims asserted in his Counterclaim and Third-Party Complaint, and (ii) [Davis]'s Motion to Amend should be granted.

The Church and the Elders timely appeal.

## II.  Analysis

The Church and the Elders raise three issues on appeal. First, they contend the trial court erred in concluding that it has subject matter jurisdiction over the matters asserted in Davis's amended counterclaim and third-party complaint. Second, they argue the trial court erred in concluding that Davis has standing to bring the claims asserted in his amended counterclaim and third-party complaint. Third, they assert the trial court erred in granting Davis's motion to amend the counterclaim and third-party complaint. We address each issue in turn.

## A. Interlocutory Jurisdiction

We acknowledge that this appeal is interlocutory. An interlocutory order is "made during the pendency of an action and does not dispose of the case but requires

further action by the trial court in order to finally determine the rights of all the parties involved in the controversy." *Flitt v. Flitt*, 149 N.C. App. 475, 477, 561 S.E.2d 511, 513 (2002) (citation omitted). There is generally no right to immediately appeal from an interlocutory order. *Id.* Immediate appeal of an interlocutory order is, however, appropriate when "the challenged order affects a substantial right that may be lost without immediate review." *McConnell v. McConnell*, 151 N.C. App. 622, 624, 566 S.E.2d 801, 803 (2002) (citation omitted).

A "substantial right" is "a right materially affecting those interests which a man is entitled to have preserved and protected by law: a material right." *Oestreicher v. Stores*, 290 N.C. 118, 130, 225 S.E.2d 797, 805 (1976) (citation and quotation marks omitted). The appellant has the burden of establishing that a substantial right will be affected unless they are allowed to immediately appeal from an interlocutory order. *Jeffreys v. Raleigh Oaks Joint Venture*, 115 N.C. App. 377, 379, 444 S.E.2d 252, 253 (1994).

The trial court's Order denying the Church and Elders' motion to dismiss and granting Davis's motion to amend is an interlocutory order. It was made during the pendency of the action and it does not dispose of the case. However, the Church and the Elders argue that their motion to dismiss should have been granted because resolution of Davis's claims would require the trial court to impermissibly entangle itself in ecclesiastical matters in violation of the First Amendment of the United

States Constitution. "First Amendment rights are substantial and . . . are implicated when a party asserts that a civil court action cannot proceed without impermissibly entangling the court in ecclesiastical matters." *Harris v. Matthews*, 361 N.C. 265, 270, 643 S.E.2d 566, 569 (2007). "When First Amendment rights are asserted, this Court has allowed appeals from interlocutory orders." *Id.* (citation omitted).

The Church and the Elders have asserted a violation of First Amendment rights. Their appeal is properly before this Court.

**B. Motion to Dismiss for Ecclesiastical Abstention**

The Church and the Elders contend the trial court erred in concluding that it had subject matter jurisdiction over the claims asserted in Davis's amended counterclaim and third-party complaint because the court would be forced to interpret and resolve ecclesiastical questions to resolve the claims.

The standard of review for a trial court's decision to deny a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) is *de novo*. *Tubiolo v. Abundant Life Church, Inc.*, 167 N.C. App. 324, 327, 605 S.E.2d 161, 163 (2004) (citation omitted). When ruling on or reviewing a Rule 12(b)(1) motion to dismiss, our courts may "consider and weigh matters outside of the pleadings." *Id.* (citation omitted). Upon review of a motion to dismiss for lack of subject matter jurisdiction, the trial court must accept the allegations in the complaint as true and construe them in the light most favorable to the non-moving party. *Johnson v. Antioch United Holy*

*Church, Inc.*, 214 N.C. App. 507, 510, 714 S.E.2d 806, 809 (2011) (citations omitted).

The trial court properly determined it had subject matter jurisdiction over Davis's claims. "The First Amendment of the United States Constitution prohibits a civil court from becoming entangled in ecclesiastical matters." *Id.* at 510, 714 S.E.2d at 810 (citing *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969)). "An ecclesiastical matter is one which concerns doctrine, creed, or form of worship of the church, or the adoption and enforcement within a religious association of needful laws and regulations for the government of membership." *W. Conf. of Original Free Will Baptists of N.C. v. Miles*, 259 N.C. 1, 10–11, 129 S.E.2d 600, 606 (1963) (citations omitted).

However, civil courts do not violate the First Amendment "merely by opening their doors to disputes involving church property." *Presbyterian Church*, 393 U.S. at 449. "And there are neutral principles of law, developed for use in all property disputes, which can be applied without 'establishing' churches to which property is awarded." *Id.* "The First Amendment therefore commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine." *Serbian E. Orthodox Diocese for U.S. of A. and Canada v. Milivojevich,* 426 U.S. 696, 710 (1976) (citation omitted). "This principle applies with equal force to church disputes over church polity and church administration." *Id.* "The dispositive question is whether resolution of the legal claim requires the court to interpret or

weigh church doctrine." *Smith v. Privette*, 128 N.C. App. 490, 494, 495 SE.2d 396, 398 (1998). "If not, the First Amendment is not implicated and neutral principles of law are properly applied to adjudicate the claim." *Id* (citation omitted). "When a party brings a proper complaint, '[w]here civil, contract[][,] or property rights are involved, the courts will inquire as to whether the church tribunal acted within the scope of its authority and observed its own organic forms and rules.'" *Harris v. Matthews*, 361 N.C. 265, 274–75, 643 S.E.2d 566, 572 (2007) (quoting *Atkins v. Walker,* 284 N.C. 306, 320, 200 S.E.2d 641, 650 (1973)).

¶ 17    Davis's claims request the following:

> (I) Declaratory judgment against the Church and the Elders, declaring that: (i) Davis is the "Bishop" and "Senior Pastor" of the Church; (ii) Davis was not an "at-will" employee of the Church; (iii) the Elders' attempt to terminate Davis's employment with the Church was unauthorized by the then-controlling Second Bylaws; and (iv) Davis is entitled to recover back-pay and benefits earned since his purported termination;
>
> (II) Preliminary and permanent injunction allowing Davis to resume employment with the Church, earning full compensation and benefits;
>
> (III) Money damages from the Elders for breach of fiduciary obligations owed to Davis and to the Church;
>
> (IV) Money damages from the Elders for wrongful interference with Davis's employment relationship with the Church;
>
> (V) Rights (i) to inspect the Church's financial records, (ii)

to receive an accounting from the Elders and the Church of Church funds or assets the Elders misappropriated, and (iii) to impose a constructive trust upon the Elders' assets in an amount equal to any Church funds or assets found to have been misappropriated; and

(VI) Money damages from the Elders for civil conspiracy to remove Davis from employment with the Church and to seize complete control of the Church's operations.

¶ 18 As Davis asserts, "[t]his is an employment dispute." The core tenet upon which all of Davis's claims depend is the determination of which bylaws governed the Church at the relevant time. Davis was an employee of the Church and now raises disputes regarding the Church's bylaws. His claims do not fall under the protections of ecclesiastical matters within the First Amendment.

¶ 19 Resolving Davis's claims requires a two-part determination: First, which bylaws were the governing authority at the relevant time, and whether Davis's termination was in accordance with the proper bylaws? Second, whether the Elders properly determined that Davis was unfit to serve as Senior Pastor of the Church?

¶ 20 The first determination may be made by applying neutral principles of law without engaging in ecclesiastical matters. *Smith*, 128 N.C. App. at 494, 495 SE.2d at 398. The trial court must first determine which set of bylaws controlled at the relevant time, based solely on contract and business law. The court will then be able to assess whether the Church's procedure for firing Davis complied with the requirements of the controlling bylaws. The court may determine that the Church's

method of terminating Davis did not comply with the requirements of the controlling bylaws, making Davis's termination void. In this instance, this dispute would be resolved without the necessity of answering the second question—whether Davis was unfit to serve—and engaging with ecclesiastical matters.

¶ 21 If the court determines that the Church's method of terminating Davis *did* comply with the requirements of the controlling bylaws, then our Courts would be required to assess whether the Church, through its Elders, properly determined that Davis was unfit to serve as Senior Pastor. That determination cannot be made applying only neutral principles of law. Answering this second question may require an impermissible engagement with ecclesiastical matters, but there is no guarantee at this stage of the proceedings that our courts will be forced to answer this second question.

¶ 22 The first determination required in the present case is analogous to *Tubiolo v. Abundant Life Church, Inc.* The plaintiffs in *Tubiolo* brought claims against the defendant church for wrongful termination, arguing that the persons who sought termination of the plaintiffs lacked the requisite authority to do so. *Tubiolo*, 167 N.C. App. at 326, 605 S.E.2d at 163. The Court in *Tubiolo* was tasked with determining what bylaws governed the actions of the defendant church, and whether the actions taken by the defendant church were in accordance with the appropriate bylaws. *Id.* at 329, 605 S.E.2d at 164. The *Tubiolo* Court noted "the courts do have jurisdiction

over the very narrow issue of whether the bylaws were properly adopted by the defendant [church]." *Id.* The *Tubiolo* Court then held, as this Court has previously acknowledged, that it is

> proper for a court to address the "very narrow issue" of whether the plaintiffs' membership was terminated in accordance with the church's bylaws—whether bylaws had been adopted by the church, and whether those individuals who signed a letter revoking the plaintiffs' membership had the authority to do so.

*Johnson*, 214 N.C. App. at 512, 714 S.E.2d at 811 (discussing the holding of *Tubiolo*, 167 N.C. App. at 329, 605 S.E.2d at 164–65). The present case requires determining which bylaws were in effect, whether new bylaws had been adopted by the Church, whether the Elders had the authority to terminate Davis, and whether the termination was done in accordance with the proper bylaws. "This inquiry can be made without resolving any ecclesiastical or doctrinal matters." *Tubiolo*, 167 N.C. App. at 329, 605 S.E.2d at 164–65. Our courts have jurisdiction over each of these determinations.

## C. Standing

The Church and the Elders argue that Davis does not have standing to bring his claims because they are derivative and brought on behalf of the Church. We disagree.

The Church and the Elders specifically argue that Davis does not have

standing to bring a derivative suit on behalf of the Church for his first, second, third, and fifth claims. N.C. Gen. Stat. § 55A-7-40(a) outlines derivative actions, providing:

> An action may be brought in a superior court of this State, which shall have exclusive original jurisdiction over actions brought hereunder, in the right of any domestic or foreign corporation by any member or director, provided that, in the case of an action by a member, the plaintiff or plaintiffs shall allege, and it shall appear, that each plaintiff-member was a member at the time of the transaction of which he complains.

N.C. Gen. Stat. § 55A-7-40(a) (2019).

A majority of Davis's first, second, third, and fifth claims allege injuries incurred in his individual capacity, and not on behalf of the Church. However, a portion of Davis's third claim appears to request money damages from the Elders for breach of their fiduciary obligations owed to the Church itself. Seeking remedy on behalf of the Church for harm done to the Church would be a derivative action. The Church and the Elders argue that Davis lacks standing to bring a derivative action as a member of the Church because the First Bylaws explicitly state that the Church has no members. A determination of which bylaws were the proper governing authority of the Church at the relevant time is necessary to the determination of whether Davis has standing to bring the derivative action in his third claim.

¶ 26      The remainder of Davis's claims are brought in an individual capacity and are not derivative on behalf of the Church.  A plaintiff must show the following three elements in order to establish individual standing:

> (1) 'injury in fact'—an invasion of a legally protected interest that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*McDaniel v. Saintsing*, 260 N.C. App. 229, 232–33, 817 S.E.2d 912, 914–15 (2018) (citation omitted).  The alleged wrongful termination of Davis is an "injury in fact" that satisfies the first element.  Davis was terminated by the actions of the Church and the Elders.  If the court finds in favor of Davis, the injury will be sufficiently redressed.

¶ 27      The trial court did not err in determining that Davis had standing to bring the claims asserted in his amended counterclaim and third-party complaint at this stage of the proceedings.

**D. Motion to Amend**

¶ 28      The Church and the Elders assert the trial court erred in granting Davis's motion to amend the counterclaim and third-party complaint under Rule 15 of the North Carolina Rules of Civil Procedure.  We review a trial court's decision to grant a motion to amend the pleadings for an abuse of discretion.  *Carter v. Rockingham*

*Cnty. Bd. Of Educ.,* 158 N.C. App. 687, 690, 582 S.E.2d 69, 72 (2003); *Mabrey v. Smith,* 144 N.C. App. 119, 121, 548 S.E.2d 183, 185–86 (2001) ("A motion to amend the pleadings is addressed to the sound discretion of the trial court."). "[A] trial judge abuses his discretion when he refuses to allow an amendment unless justifying reasoning is shown." *Taylor v. Triangle Porsche–Audi, Inc.,* 27 N.C. App. 711, 714, 220 S.E.2d 806, 809 (1975) (citing *Foman v. Davis,* 371 U.S. 178, 182 (1962)). "Generally, Rule 15 is construed liberally to allow amendments where the opposing party will not be materially prejudiced." *Delta Envtl. Consultants of N.C., Inc. v. Wysong & Miles Co.,* 132 N.C. App. 160, 165, 510 S.E.2d 690, 694 (1999) (citation omitted).

¶ 29 The Church has not shown reason justifying a denial of Davis's motion to amend or any materially unfair prejudice as a result of the trial court's decision to grant Davis's motion to amend. The trial court did not abuse its discretion by granting Davis's motion to amend the counterclaim and third-party complaint.

## III. Conclusion

¶ 30 We hold the trial court did not err in determining it had subject matter jurisdiction over Davis's counterclaims and third-party complaint at this stage of the proceedings. The Church's motion to dismiss for lack of subject matter jurisdiction was properly denied. The trial court did not err in determining Davis had standing to bring the counterclaims and third-party complaint. We hold there was no abuse of

discretion in the trial court's decision to grant Davis's motion to amend the counterclaim and third-party complaint. The Order of the trial court is affirmed.

AFFIRMED.

Judge ARROWOOD concurs.

Judge MURPHY concurs in part and dissents in part by separate opinion.

MURPHY, Judge, concurring in part and dissenting in part.

While I concur with the Majority's analysis regarding our jurisdiction over this interlocutory appeal, *supra* at ¶¶ 9-12, I respectfully dissent from its conclusion that we have subject matter jurisdiction over this appeal. *Supra* at ¶¶ 15, 18. I would reverse the trial court's order denying the motion to dismiss for lack of subject matter jurisdiction, which would render the issue regarding Davis's standing moot. I would also hold the trial court lacked subject matter jurisdiction over the complaint, counterclaim, and amended counterclaim and remand for the trial court to dismiss the action with prejudice.[1]

## ANALYSIS

### A. Complete Entanglement of the Original Counterclaim

"Civil court intervention into church property disputes is proper *only when* 'relationships involving church property [have been structured] *so as not to require* the civil courts to resolve ecclesiastical questions.'" *Harris v. Matthews*, 361 N.C. 265, 271, 643 S.E.2d 566, 570 (2007) (emphases added) (marks in original) (quoting *Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449, 21 L. Ed. 2d 658, 665 (1969)); *Western Conference of Original Free Will Baptists of N.C. v. Creech*, 256 N.C. 128, 140, 123 S.E.2d 619, 627

---

[1] For ease of reading, "counterclaim" and "original counterclaim" refer to both the counterclaim and third-party complaint filed 24 October 2019. "Amended counterclaim" refers to the amended counterclaim and third-party complaint filed 30 July 2020.

(1962) (marks omitted) ("The legal or temporal tribunals of the State have no jurisdiction over, and no concern with, purely ecclesiastical questions and controversies but the courts do have jurisdiction, as to civil, contract and property rights which are involved in, or arise from, a church controversy."). Our Supreme Court has defined an ecclesiastical matter as

> one which concerns doctrine, creed, or form of worship of the church, or the adoption and enforcement within a religious association of needful laws and regulations for the government of membership, and the power of excluding from such associations those deemed unworthy of membership by the legally constituted authorities of the church; and all such matters are within the province of church courts and their decisions will be respected by civil tribunals.

*Eastern Conference of Original Free Will Baptists of N.C. v. Piner*, 267 N.C. 74, 77, 147 S.E.2d 581, 583 (1966) (quoting *Western Conference of Original Free Will Baptists of N.C. v. Miles*, 259 N.C. 1, 10-11, 129 S.E.2d 600, 606 (1963)), *overruled in part by Atkins v. Walker*, 284 N.C. 306, 200 S.E.2d 641 (1973). "When a congregational church's internal property dispute cannot be resolved using neutral principles of law, the courts must intrude no further[.]" *Harris*, 361 N.C. at 271-72, 643 S.E.2d at 570. Such judicial intrusion would constitute "impermissibl[e] entangle[ment] in the dispute." *Id.* at 273, 643 S.E.2d at 571.

**1. "Spiritual Leader"**

Davis's original counterclaim repeatedly requested judicial recognition that he

is "the Bishop, Senior Pastor and *spiritual leader of the Church*."  (Emphasis added).

Davis specifically claimed he "is entitled to *judgment declaring* that [he] is the Bishop,

Senior Pastor and spiritual leader of the Church[.]"  (Emphasis added).  The trial

court stated it had subject matter jurisdiction over *the original counterclaim* and

allowed Davis's motion to amend.  Despite stating in his motion to amend that the

purpose was "to amend the factual allegations of the [original counterclaim][,] . . . add

a claim for back pay and benefits[,] . . . and . . . add a claim for civil conspiracy[,]"

Davis's amended counterclaim also removed the "spiritual leader" language

throughout.  The amended counterclaim included a request for a "judgment declaring

that [Davis] is the Bishop and Senior Pastor of the Church."  Davis's requests for

recognition as the "Bishop" and "Senior Pastor" throughout the amended

counterclaim included that language, sans the additional term "spiritual leader."  The

removal of the "spiritual leader" language did not fit the stated purpose for amending

the counterclaim and suggests an attempt to avoid the prohibition against reviewing

purely ecclesiastical issues.  Further, the removal of "spiritual leader" underscores

the religious nature of the "Bishop" and "Senior Pastor" terms, as well as the

similarity and connectedness of all three terms.  The original counterclaim required

impermissible entanglement in ecclesiastical matters and should have been

dismissed for lack of subject matter jurisdiction.

¶ 34        Davis's request for recognition as the "spiritual leader" of the Church was an

explicit request for judicial review of his role within the Church. Davis's request would require

> an examination of the church's view of the role of the pastor, staff, and church leaders[.] . . . Because a church's religious doctrine and practice affect its understanding of each of these concepts, seeking a court's review . . . is no different than asking a court to determine whether a particular church's grounds for membership are spiritually or doctrinally correct[.] . . . None of these issues can be addressed using neutral principles of law."

*Id.* at 273, 643 S.E.2d at 571.

**2. Bylaws–"Special Meeting" and "Congregation"**

¶ 35      Even assuming, *arguendo*, that a later set of bylaws controls the purported termination of his role as Bishop, Pastor, and spiritual leader of the Church, as Davis claimed, such bylaws would require a special meeting with a specific percentage of congregants to vote for his termination. According to both his original counterclaim and amended counterclaim, "the New Bylaws expressly provide[] that the Bishop of the Church can be dismissed only by a 75% vote of the congregation attending a Special General Meeting called for that purpose. No Special General Meeting of the congregation was convened[.]" What constitutes such a special meeting to dismiss Davis from that role, as well as the definition of congregants or members of the Church, are ecclesiastical matters, which courts may not analyze and where we may not exercise the authority of the State. *See Azige v. Holy Trinity Ethiopian Orthodox*

*MURPHY, J., concurring in part and dissenting in part.*

*Tewahdo Church*, 249 N.C. App. 236, 241, 790 S.E.2d 570, 574 (2016) ("Membership in a church is a core ecclesiastical matter.  The power to control church membership is ultimately the power to control the church.  It is an area where the courts of this State should not become involved.  This stricture applies regardless of whether the church is a congregational church, incorporated or unincorporated, or an hierarchical church."), *disc. rev. denied*, 369 N.C. 532, 797 S.E.2d 290 (2017); *Emory v. Jackson Chapel First Missionary Baptist Church*, 165 N.C. App. 489, 493, 598 S.E.2d 667, 671 (2004) ("As the trial court would be required to delve into 'ecclesiastical matters' regarding how the church interprets [bylaw requirements such as] types of meetings, the trial court [lacked] subject matter jurisdiction.").

> We are prohibited from becoming entangled in ecclesiastical matters and have no jurisdiction over disputes which require an examination of religious doctrine and practice in order to resolve the matters at issue. . . .  Only when an issue to be determined in connection with a party's claim is a *purely secular* one, then neutral principles of law govern the inquiry and subject matter jurisdiction exists in the trial court over the claim. . . .  Therefore, because a church's religious doctrine and practice affect its understanding of each of the concepts at issue, [the trial court's involvement] is like asking a court to determine whether a particular church's grounds for membership are spiritually or doctrinally correct or whether a church's charitable pursuits accord with the congregation's beliefs, which are barred.

*Lippard v. Holleman*, 271 N.C. App. 401, 408, 410-11, 844 S.E.2d 591, 598-99, 600 (citations and marks omitted), *disc. rev. denied, appeal dismissed*, 375 N.C. 492, 847

S.E.2d 882 (2020), *cert. denied*, 594 U.S. __, 2021 WL 2637859 (2021).

¶ 36        The entirety of the original counterclaim should have been dismissed for lack of subject matter jurisdiction, as it required the trial court to delve into ecclesiastical matters. On appeal, judicial analysis of Davis's original counterclaim requires impermissible entanglement in this dispute, as no neutral principles of law can be applied to determine whether Davis is the spiritual leader of the Church, whether a special meeting was held to dismiss him from that role, and who constituted a congregant or member of the Church. The Majority's approach jeopardizes the Church's "First Amendment values," as this "church property litigation . . . turn[s] on the resolution by civil courts of controversies over *religious doctrine and practice*." *Harris*, 361 N.C. at 271, 643 S.E.2d at 570 (quoting *Presbyterian*, 393 U.S. at 449, 21 L. Ed. 2d at 665). I would hold the trial court lacked subject matter jurisdiction over Davis's original counterclaim; we should reverse the order for lack of subject matter jurisdiction and remand to the trial court to dismiss the action with prejudice, rendering the issue regarding Davis's standing moot. *See id.* at 275, 643 S.E.2d at 572.

## B. The Amended Counterclaim

¶ 37        As previously noted, the original counterclaim should have been dismissed as requiring impermissible judicial entanglement in ecclesiastical matters due to Davis's request for judicial recognition as the spiritual leader of the Church, as well

as the requirements under the later set of bylaws. However, even if the original counterclaim was overlooked and the amended counterclaim was the sole focus of our analysis, the amended counterclaim still requires impermissible judicial entanglement in ecclesiastical matters. The following portions of the amended counterclaim, which mirror similar requests and references in the original counterclaim, are ecclesiastical matters requiring impermissible judicial entanglement:

> 35. [Davis] is entitled to judgment declaring that:
>
> (a) [he] is the Bishop and Senior Pastor of the Church;
>
> . . .
>
> (d) [and that his] appearances on Church property to conduct church services, minister to the congregation, and otherwise perform his duties as Bishop and Senior Pastor of the Church were and are lawful[.]
>
> . . . .
>
> 38. . . . [T]he Third-Party Defendants, purporting to act on behalf of and in the name of the Church, have unlawfully interfered and will continue to interfere with [Davis's] employment relationship with the Church and with his performance of duties as the Bishop and Senior Pastor of the Church, unless restrained by this Court.
>
> 39. [Davis] is entitled to a preliminary and permanent injunction enjoining, restraining and directing plaintiff and the Third-Party Defendants, as follows:
>
> (a) to allow [Davis] to resume his role and duties as the Bishop and Senior Pastor of the Church, with full

compensation and benefits, until such time as the Church's congregation may vote to remove [him] in accordance with the requirements of the New Bylaws of the Church;

(b) to refrain from excluding [Davis] from the Church premises and/or any other Church properties; and

(c) to refrain from taking any action to interfere with, subvert or disrupt [Davis] in the performance of his duties as the Bishop and Senior Pastor of the Church.

. . . .

41. A fiduciary relationship of trust and confidence existed between [Davis], as the Bishop and Senior Pastor of the Church, and the Third-Party Defendants as Elders of the Church.

42. A fiduciary relationship of trust and confidence also existed between the Third-Party Defendants as Elders and the Plaintiff Church they were supposed to serve.

43. Due to the fiduciary relationship that existed between them, the Third-Party Defendants were required in equity and in good conscience to act honestly, in good faith and in the best interests of the Church and [Davis] as the Bishop and Senior Pastor of the Church.

44. . . . [T]he Third-Party Defendants[] have breached their fiduciary duties owed to [Davis] and the Church, in that the Third-Party Defendants have arrogated to themselves the sole management and control of the Church and have prevented [Davis] from exercising his rightful role as the Bishop and Senior Pastor of the Church, all in violation of the requirements of the New Bylaws of the Church.

45. As a direct and proximate result of the Third-Party Defendants' breaches of their fiduciary duties[,] . . . [Davis] has been damaged . . . .

. . . .

49. The Third-Party Defendants intentionally induced the Plaintiff church to breach the employment relationship that existed between the Church and [Davis], and in so doing the Third-Party Defendants acted with malice and without justification.

. . . .

52. . . . [T]he Third-Party Defendants have utilized Church assets to fund this litigation against [Davis].

53. Additionally, the Church maintained a "Key Man" insurance policy issued by New York Life Insurance company on the life of [Davis's] father [who was] his predecessor as the Bishop and Senior Pastor of the Church, in a benefit amount believed to be several million dollars. Upon information and belief, after [Davis's] father died in August of 2015, a majority of the benefit amount of that policy was paid to the Church.

54. Because the Third-Party Defendants arrogated to themselves all control and management of the Church's business affairs and activities, to the exclusion of [Davis] notwithstanding his status and role as the Bishop and Senior Pastor of the Church, [Davis] has been unable to determine how those insurance proceeds have been utilized by the Third-Party Defendants and whether those proceeds have been properly devoted to the Church's benefit.

55. [Davis], as the Bishop and Senior Pastor of the Church, is entitled to inspect the books and records of the Church, in order to determine how Church assets and funds have been utilized and whether any such assets or funds have been misused or misappropriated by the Third-Party Defendants.

56. [Davis] is entitled to a complete accounting from the Church and the Third-Party Defendants for any and all

items of Church property and money diverted, misappropriated, received, used or expended by the Third-Party Defendants, or any of them.

57. [Davis] is further entitled to have a constructive trust imposed upon the assets of the Third-Party Defendants, for the benefit of the Church, in an amount equal to any Church money or property found by this Court to have been wrongfully misappropriated or taken by the Third-Party Defendants, or any of them.

. . . .

59. The Third-Party Defendants . . . formed an agreement among themselves to do unlawful acts or to do lawful acts in an unlawful way, resulting in injury to the Third-Party Plaintiff, [Davis].

60. After [Davis] discovered the existence of the New Bylaws in November of 2017 and demanded the resignations of the Third-Party Defendants as Elders of the Church, the Third-Party Defendants conspired among themselves to oust [him] and his family members from the Church and thereby arrogate to themselves full control of the Church's operations and activities.

61. Pursuant to their conspiracy, as described above, the Third-Party Defendants committed, or caused to be committed, the following overt acts:

. . . .

(b) In January of 2018, the Third-Party Defendants submitted to [Davis] a purported "evaluation" of his performance. No such "performance evaluation" had ever been previously done on the Bishop and Senior Pastor of the Church, and the Third-Party defendants had no authority under the New Bylaws to conduct such an "evaluation."

(c) Throughout 2018 and the first half of 2019, the Third-Party Defendants refused to meet with [Davis] and instead actively worked to undermine [his] leadership role as the Bishop and Senior Pastor of the Church.

. . . .

WHEREFORE, . . . Davis prays the Court for relief as follows:

. . .

3. That the [trial] [c]ourt issue an Order requiring the Church and the Third-Party Defendants to appear and show cause why [his] Motion for Preliminary Injunction should not be granted;

4. That, following a hearing on [Davis's] Motion for Preliminary Injunction, the [trial] [c]ourt issue an Order of Preliminary Injunction directing, enjoining and restraining the Church, the Third-Party Defendants, and all other persons or entities acting at their instruction or in concert with any of them, as follows:

(a) to allow [Davis] to resume his role and duties as the Bishop and Senior Pastor of the Church, with full compensation and benefits, to include back pay from June 2019, pending further Order of the [trial] [c]ourt or until such time as the Church's congregation may vote to remove [Davis] in accordance with the requirements of the New Bylaws of the Church;

(b) to refrain from excluding [Davis] from the Church premises and/or any other Church properties; and

(c) to refrain from taking any action to interfere with, disrupt or subvert [Davis] in the performance of his duties as the Bishop and Senior Pastor of the Church.

5. That, following a trial on the merits, the [trial] [c]ourt

enter judgment in favor of [Davis] and against the Church and the Third-Party Defendants on [Davis's] Counterclaim and Third-Party Complaint as follows:

(a) Declaring that [Davis] is the Bishop and Senior Pastor of the Church; that [Davis's] employment relationship with the Church is not an "at-will" employment but instead is an employment relationship governed by the New Bylaws of the Church; that the purported "termination" of [Davis's] employment with the Church, undertaken by the Third-Party Defendants acting on behalf of and in the name of the Church, was contrary to the New Bylaws and therefore unlawful; that [Davis's] appearances on Church property to conduct church services, minister to the congregation, and otherwise perform his duties as Bishop and Senior Pastor of the Church were and are lawful; and that [Davis] is entitled to receive back pay and benefits from the Church from the date of the purported termination of his employment with the Church.

(b) Entering an Order of Permanent Injunction, directing, enjoining and restraining the Church, the Third-Party Defendants, and all other persons or entities acting at their instruction or in concert with them, to allow [Davis] to perform his role and duties as the Bishop and Senior Pastor of the Church, with full compensation and benefits, until such time as the Church's congregation may vote to remove [Davis] in accordance with the requirements of the New Bylaws of the Church; to refrain from excluding [Davis] from the Church premises and/or any other Church properties; and to refrain from taking any action to interfere with, disrupt or subvert [Davis] in the performance of his duties as the Bishop and Senior Pastor of the Church.

. . . .

(d) Ordering the Church and the Third-Party Defendants to [p]ermit [Davis] to inspect the books and records of the Church; ordering the Third-Party Defendants to provide a

complete accounting for all items of church money or property misappropriated, diverted, received, used or expended by the Third-Party Defendants, or any of them; and imposing a constructive trust upon the assets of the Third-Party Defendants, for the benefit of the Church, in an amount equal to any Church money or property found to have been wrongfully misappropriated or taken by the Third-Party Defendants, or any of them.

### 1. "Bishop" and "Senior Pastor"

¶ 38 As identified above, Davis still requests a "judgment declaring that [he] is the Bishop and Senior Pastor of the Church" in Paragraph 35(a) of his amended counterclaim, and includes repeated statements that he is "the duly installed Bishop and Senior Pastor of the Church." These requests and references require a court to determine what constitutes a "bishop" and a "senior pastor," and how such a leader can be "duly installed." Such a determination would run afoul of our caselaw prohibition against judicial "examination of the church's view of the role of the pastor, staff, and church leaders[.]" *Harris*, 361 N.C. at 273, 643 S.E.2d at 571. The ecclesiastical nature of Davis's requests and references is evidenced by his repeated pairing of the positions of "Bishop and Senior Pastor" with "conduct[ing]," "resum[ing]," and "perform[ing] his duties," as well as "exercising his rightful role" in the Church. For example, Davis asks for a judicial intervention into the purported unlawful interference with his "employment relationship with the Church and with his performance of duties as the Bishop and Senior Pastor of the Church[.]" Courts

may not define the role, duties, and services of a church's leader; but, by affirming its denial of the motion to dismiss, that is exactly what the Majority has allowed the trial court to do. *See id.*; *supra* at ¶¶ 14-15.

**2. Fiduciary Relationship**

¶ 39        Further, Davis claims that "[a] fiduciary relationship of trust and confidence existed between [him], as the Bishop and Senior Pastor of the Church, and the Third-Party Defendants as the Elders of the Church[,]" and that "the Third-Party Defendants[] . . . breached their fiduciary duties owed to [Davis] and the Church" by "arrogat[ing] to themselves the sole management and control of the Church[.]" Davis's breach of fiduciary duty claim is similar to the plaintiffs' allegations in *Harris*. Our Supreme Court has already determined that the ecclesiastical entanglement doctrine prohibits judicial review of whether a church's internal governing body "breached [its] fiduciary duties by improperly using church funds." *Harris*, 361 N.C. at 273, 643 S.E.2d at 571. Such a review required an improper "examination of the church's view of the role of the pastor, staff, and church leaders, their authority and compensation, and church management." *Id.* We similarly cannot examine the role and relationship between the elders and a pastor, as it involves an improper review of not only roles, duties, and authority, but also church management.

**3. Employment Relationship**

¶ 40        Davis also claims "[a] valid employment relationship existed between [him

and] the Church[,] . . . [and] [t]he Third-Party Defendants intentionally induced the Plaintiff Church to breach the employment relationship that existed between the Church and [Davis], and in so doing the Third-Party Defendants acted with malice and without justification." "[T]he application of a secular standard to secular conduct that is tortious is not prohibited by the Constitution," and tortious conduct could be analyzed if neutral laws could be applied. *Smith v. Privette*, 128 N.C. App. 490, 494, 495 S.E.2d 395, 397 (marks omitted), *appeal dismissed*, 348 N.C. 284, 501 S.E.2d 913 (1998). However, "the decision to hire or discharge a minister is inextricable from religious doctrine and protected by the First Amendment from judicial inquiry." *Id.* at 495, 495 S.E.2d at 398. Whether the decision to fire Davis was due to failure to perform a religious role or was nefarious would require the examination of religious doctrine, and we cannot allow such an examination.

**4. "Church's Benefit"**

¶ 41    In his fifth claim for relief in the amended counterclaim, Davis argues "the Third-Party Defendants have utilized Church assets to fund this litigation against [Davis,]" which entitles Davis "to have a constructive trust imposed upon the assets of the Third-Party Defendants" in the amount of funds "wrongfully misappropriated or taken[.]" According to Davis, he and, by inference, the trial court, must be allowed to inspect Church records to determine whether the portion of a keyman life insurance policy paid to the Church has "been properly devoted to the Church's

benefit."

> Determining whether actions, *including expenditures*, by a church's [staff and leadership] were proper requires an examination of the church's view of the role of the pastor, staff, and church leaders, their authority and compensation, and church management. Because a church's religious doctrine and practice affect its understanding of each of these concepts, seeking a court's review of the [expenditures] is no different than asking a court to determine whether a particular church's grounds for membership are spiritually or doctrinally correct or whether a church's charitable pursuits accord with the congregation's beliefs. None of these issues can be addressed using neutral principles of law.

*Harris*, 361 N.C. at 273, 643 S.E.2d at 571 (emphasis added). What constitutes the proper devotion of life insurance proceeds toward the Church's benefit is an analysis inextricably linked to ecclesiastical issues, and we cannot permit such an analysis.

**5. Control of the Church**

¶ 42    Davis's civil conspiracy claim is replete with references to the Third-Party Defendants attempting to "arrogate to themselves full control" of the Church, acting with "no authority," "actively work[ing] to undermine [Davis's] leadership role," and terminating Davis without the "75% affirmative vote of the congregation" required under the bylaws. Judicial engagement with claims concerning membership, roles, and duties within the Church requires an analysis we may not conduct. *See id.*;

*Emory*, 165 N.C. App. at 492-93, 598 S.E.2d at 670-71.[2]

**6. Injunctive Relief**

¶ 43     Finally, Davis's prayer for relief requests a judicial determination, via injunction, that "allow[s] [Davis] to resume his role and duties as the Bishop and Senior Pastor of the Church" until another court order or congregational removal via "the requirements of the New Bylaws of the Church" takes effect.  He also requests a judicial declaration "that [he] is the Bishop and Senior Pastor of the Church[,] . . . that the purported 'termination' . . . was contrary to the New Bylaws[,] . . . [and] that [his] . . . perform[ance of] his duties as the Bishop and Senior Pastor of the Church were and are lawful[.]"  According to Davis, "the New Bylaws expressly provide[] that the Bishop of the Church can be dismissed only by a 75% vote of the congregation attending a Special General Meeting called for that purpose.  No Special General Meeting of the congregation was convened[.]"  As previously discussed, the ecclesiastical entanglement doctrine prohibits judicial review of roles within a church, or of what constitutes an appropriate special meeting or membership within a church.  *See Harris*, 361 N.C. at 273, 643 S.E.2d at 571; *Emory*, 165 N.C. App. at 492-93, 598 S.E.2d at 670-71.  The trial court did not have subject matter jurisdiction

---

[2] Davis also argues his mother was wrongfully terminated, but he lacks standing to bring such a claim.  *See Munger v. State*, 202 N.C. App. 404, 409, 689 S.E.2d 230, 235 (2010) (marks omitted) ("The rationale of the standing rule is that only one . . . personally injured . . . can be trusted to battle the issue."), *disc. rev. denied*, 365 N.C. 3, 705 S.E.2d 734 (2011).

over Davis's request for a positive injunction in his prayer for relief.

**7. Conclusion**

¶ 44      Even assuming, *arguendo*, we should review the amended counterclaim rather than the original counterclaim, each of Davis's claims require judicial review of ecclesiastical matters, which runs afoul of the ecclesiastical entanglement doctrine. Davis's amended counterclaim should have been dismissed for lack of subject matter jurisdiction, and we lack subject matter jurisdiction over the amended counterclaim on appeal. We should remand to the trial court for dismissal of the amended counterclaim, with prejudice. *Harris*, 361 N.C. at 275, 643 S.E.2d at 572.

**C. Lack of Subject Matter Jurisdiction Over Plaintiffs' Complaint**

¶ 45      "Whether a trial court has subject-matter jurisdiction is a question of law, reviewed *de novo* on appeal. An appellate court has the power to inquire into subject-matter jurisdiction in a case before it at any time, even *sua sponte*." *Henson v. Henson*, 261 N.C. App. 157, 160, 820 S.E.2d 101, 104 (2018) (citation and marks omitted). The complaint is properly analyzed within this appeal, Davis's original counterclaim and amended counterclaim included an answer to the complaint, and the Majority does not review whether the trial court had subject matter jurisdiction over the matter from the start. *See Hayes v. Turner*, 98 N.C. App. 451, 454-55, 391 S.E.2d 513, 515 (1990) ("[The plaintiff's] complaint in summary ejectment alleges that there was no rent and that no lease existed. The record contains neither allegations

nor evidence of a landlord-tenant relationship, and [the plaintiff] also failed to allege any of the statutory violations. [The plaintiff's] amended complaint also fails to assert the required allegations for summary ejectment or for any other cause of action. We therefore, *sua sponte*, conclude that the trial court lacked subject matter jurisdiction to hear the summary ejectment action. We therefore vacate the trial court's grant of summary judgment for [the] plaintiff on [the] plaintiff's cause of action and remand for dismissal of that action."). I would review the complaint to see whether it too runs afoul of the ecclesiastical entanglement doctrine.

¶ 46        The complaint alleges that "[t]he Plaintiff is the owner and lawful possessor of the Premises[,]" "[Davis] continues to attempt to hold unauthorized services and meetings at Plaintiff's facilities[,]" "[Davis] has disrupted the ongoing legitimate ministries of the Plaintiff and prevented the Plaintiff from carrying on its mission[,]" and "[Davis], by his unauthorized collection and retention of funds and by his failure to return Plaintiff's property, has committed conversion of Plaintiff's property." Much like Davis's counterclaims, these allegations require improper judicial inquiry into Church governance and membership as it relates to the appropriate leaders and owners of the premises, as well as who has the authority to approve Davis in his attempt to hold services and meetings. *See Harris*, 361 N.C. at 273, 643 S.E.2d at 571; *Emory*, 165 N.C. App. at 492-93, 598 S.E.2d at 670-71. Further, in addition to these allegations, the complaint requires impermissible analysis of what constitutes

the legitimate ministry and mission of the Church: "[Davis] has disrupted the ongoing legitimate ministries of the Plaintiff and prevented the Plaintiff from carrying on its mission[.]" *See generally Piner*, 267 N.C. at 77, 147 S.E.2d at 583. Finally, the complaint requests judicial analysis of alleged unauthorized conversion of Church property, which is similar to Davis's claims and those of the plaintiffs' improper request in *Harris* for judicial determination of whether expenditures were proper. *See Harris*, 361 N.C. at 273, 643 S.E.2d at 571.

¶ 47       The complaint also requires judicial review of roles within and doctrine of the Church, which runs afoul of the ecclesiastical entanglement doctrine. For this reason, the trial court did not have subject matter jurisdiction over the complaint, and we must remand to the trial court to dismiss it with prejudice along with the original counterclaim and amended counterclaim. *See id.* at 275, 643 S.E.2d at 572.

## CONCLUSION

¶ 48       Our courts may not intrude on church disputes that cannot be resolved via only neutral principles of law. Such judicial intrusion constitutes impermissible entanglement in ecclesiastical matters and is prohibited by the First Amendment. The determination of issues from Davis's original counterclaim requires judicial review of ecclesiastical matters. Even if we were to review Davis's amended counterclaim, each claim still requires judicial review of ecclesiastical matters. Finally, the original complaint similarly requires judicial review of ecclesiastical

matters. As a result, the trial court lacked subject matter jurisdiction over the entirety of this matter.

While I concur that the Order is properly before us as an interlocutory appeal, I would reverse the trial court's order denying the motion to dismiss for lack of subject matter jurisdiction, rendering the issue regarding Davis's standing moot. I would also hold the trial court lacked subject matter jurisdiction over the complaint, counterclaim, and amended counterclaim and remand for the trial court to dismiss the action with prejudice. For these reasons, I respectfully dissent.